WILSON, J.,
for the Court:
¶ 1. On January 17, 2014, the Simpson County Chancery Court granted Amanda Reece Layton a divorce from John Layton Jr. on the ground of habitual cruel and inhuman treatment. On appeal, John challenges the chancellor’s equitable distribution of the couple’s property and debts, award of alimony to Amanda, and provisions of the judgment requiring him to obtain a life insurance policy for Amanda’s benefit and pay her attorney’s fees. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. Amanda and John were married on July 8, 2000, in Pike County. They separated on July 22, 2010. There were no children born to the marriage.[1] John filed a complaint for divorce on August 8, 2010, alleging adultery and habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. Amanda responded and counterclaimed for divorce on the grounds of habitual cruel and inhuman treatment, habitual drunkenness, and adultery or, in the alternative, irreconcilable differences.
¶ 3. The chancellor held a hearing on January 10, 2011, and entered a temporary order requiring John to provide health insurance for Amanda, to return a car to her and pay the insurance and debts related to it, to pay $2,630 per month in temporary alimony, and to not dissipate assets. John was given use of a truck and the marital home and required to pay the associated debts and insurance. Amanda was ordered to pay $780 in credit card bills.
¶ 4. The case was tried in four different courthouses over parts of eleven days during the next two-plus years. The chancellor entered the final judgment on January 17, 2014, granting Amanda a divorce from John on the ground of John’s habitual cruel and inhuman treatment.[2]
¶ 5. The chancellor found that John, who works as an oilfield drilling consultant, had a gross monthly income of $22,000 and net monthly income of $13,420 at the time of trial. In contrast, Amanda was employed as a medical office assistant with a gross monthly income of only $1,381, and she had moved back in with her parents in order to make ends meet. Amanda attended junior college and several semesters of college on two different occasions a number of years ago but never graduated. The chancellor concluded that she was un *279 likely to complete any college degree at this point.
¶ 6. The chancellor calculated that his equitable distribution of the parties’ assets and liabilities left John with total assets of $505,701.41 and total debt of $874,183.91. Marital assets given to John include, inter alia, the marital home, valued at $320,000; a separate 30-acre tract of land, valued at $60,000; a truck; a Hummer; a tractor; a mower; two ATVs; a horse trailer; five horses; a boat; and a one-half interest in a mobile home. The marital debts assigned to John include, inter alia, the mortgage on the marital home of $263,789; the debt on the separate 30-aere tract of $31,407; various federal and state tax debts totaling approximately $366,000; and the debt on a 2010 Lexus being driven by Amanda of $54,610. The chancellor also found that $86,311.44, representing nine-twelfths of the couple’s 2011 federal tax debt, was nonmarital debt for which John was solely responsible. Finally, the chancellor found that John owed $48,578 on a 2011 Chevy Tahoe that he had purchased after the court’s 2011 temporary order, which the chancellor deemed a nonmarital debt. John does not challenge any of these findings on appeal. The chancellor included the two nonmarital debts in his calculation of John’s total debt.
¶7. The chancellor calculated that his equitable distribution left Amanda with assets of $82,545.24 and debt of $20,039. This included the. 2010 Lexus, valued at $46,000; some personal property; and miscellaneous debts. .The chancellor also awarded Amanda $2,900 per month in periodic alimony. Finally, the chancellor ordered John to obtain a $100,000 life insurance policy with Amanda as the beneficiary and to pay ■ Amanda’s attorney’s fees of $38,085.93.
¶ 8. John does not contest the chancellor’s finding that Amanda was entitled to divorce on the ground of habitual cruel and inhuman treatment, He challenges only the financial aspects of the divorce judgment. On appeal, he asserts that the chancellor erred by assigning him the bulk of the parties’ debt, by awarding alimony, and by requiring him to obtain a life insurance policy with Amanda as the beneficiary and to pay her attorney’s fees.
STANDARD OF REVIEW
¶ 9. “Under the standard of review utilized to review a chancery court’s findings of fact, particularly in the areas of divorce [and] alimony ..., this Court will not overturn the court on 'appeal unless its findings were manifestly wrong.” In re Dissolution of Marriage of Wood, 35 So.3d 507, 512 (¶ 8)(Miss.2010) (quoting Duncan v. Duncan, 774 So.2d 418, 419 (¶ 4) (Miss.2000)). A finding .is. not “manifestly wrong” unless,the error is “unmistakable, clear, plain, or indisputable.” Mosley v. Atterberry, 819 So.2d 1268, 1272 (¶ 16) (Miss.2002).
¶ 10. Pure questions of law are reviewed de novo. Wood, 35 So.3d at 512 (¶ 8). However, when reviewing a chancellor’s equitable distribution of property, this Court does not apply or reevaluate the Ferguson factors[3] de novo but only “reviews the judgment to ensure that the chancellor followed the appropriate standards and did not abuse his discretion.” Phillips v. Phillips, 904 So.2d 999, 1001 (¶ 8) (Miss.2004). Likewise, when reviewing decisions on alimony, we do not apply or reweigh' the Armstrong factors[4] de novo but instead recognize that “[a]limony *280 awards are within the discretion of the chancellor, and ... will not be reversed on appeal unless [the chancellor] abused his discretion.” Parker v. Parker, 934 So.2d 359, 361 (¶ 3) (Miss.Ct.App.2006) (quoting Ethridge v. Ethridge, 648 So.2d 1143, 1145-46 (Miss.1995)); accord Tilley v. Tilley, 610 So.2d 348, 351 (Miss.1992) (“The amount of alimony awarded is a matter primarily within the discretion of the chancery court because of its peculiar opportunity to sense the equities of the situation before it.”). Finally, “[t]he award of attorney fees in divorce cases is left to the discretion of the chancellor, assuming he follows the appropriate standards.” Creekmore v. Creekmore, 651 So.2d 513, 520 (Miss.1995).
. ANALYSIS
I. Equitable Distribution
¶ IT. John first complains that the chancellor assigned of all of the couple’s $450,000-plus tax debt to him, which ultimately left him with total debts that exceeded his total assets by $368,482.' Specifically, John claims that the' chancellor “found that $452,587.83 of the taxes owed by the parties was marital debt but made John pay all of it.” This is not entirely correct. As noted above, the chancellor found that $86,311.44 of the couple’s 2011 tax debt was John’s nonmarital debt , and his responsibility alone, and John has not challenged this factual finding on appeal.
¶12. More important for purposes of this appeal; John’s' argument on this issue fails to identify any abuse of discretion or reversible error. John quotes the eight factors enumerated in Ferguson but addresses only two: he notes (correctly) that the chancellor found that neither party was more wasteful than the other (factor two) and then asserts (incorrectly) that “[t]he fifth factor set forth in Ferguson, i.e., ‘Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution,’ was ignored by the lower court.” This is incorrect. The chancellor specifically noted: “No testimony was presented ... regarding this factor.. 1. [T]he Court is aware [a] federal tax lien attaches to all real and personal property of the parties.” John simply misunderstands the meaning and application of this factor. It requires the chancellor to consider tax consequences ' resulting from the division of property itself, see Davis v. Davis, 832 So.2d 492, 500-02 (¶¶ 30-37) (Miss.2002), not the' mere happenstance that some of the couple’s preexisting debts are tax debts. As the chancellor correctly found, there is no evidence that assignment of the tax debt to John had any additional tax consequences.[5] John’s flawed criticism of the chancellor’s consideration of one of the eight Ferguson factors has no merit.
:¶ 13. John ultimately. asserts that reversal is required because “[t]here is nothing in the record to support such a vast disparity in debt delegation.” This simply is not the case. The chancellor considered each of the eight Ferguson factors and found, inter alia, that Amanda had “done her best to contribute to the stability and the harmony of the marital relationship despite John’s abusive ways”; and' that John has substantial income, earning power, and prospects, whereas Amanda does *281 not. Indeed, at-the time of trial, John’s net income was ten times Amanda’s.gross income. John does not challenge .these underlying factual findings on appeal. The chancellor also noted that he had given John the vast majority of the real and personal property to which the tax liens attached and that John, not Amanda, had the ability to repay the tax debts.
¶14. The chancellor’s decision was not an abuse of discretion. “[T]he goals of equitable distribution are á fair division of marital property based on the facts of each case and termination of the legal relationship in a manner which each party may realize self-sufficiency.” Seymour v. Seymour, 960 So.2d 513, 519 (¶ 15) (Miss.Ct.App.2006) (citing Ferguson, 639 So.2d at 929). “Equitable distribution does not mean equal distribution,” however, id. (quoting Lauro v. Lauro, 924 So.2d 584, 590 (¶ 23) (Miss.Ct.App.2006)); and “an unequal division may 'be appropriate under certain circumstances,” Dickerson v. Dickerson, 34 So.3d 637, 645 (¶ 30) (Miss.Ct.App.2010). The chancellor’s determination that this is such a case was not abuse of discretion. Considering the chancellor’s unchallenged findings regarding the vast disparity in the parties’ present income and future earning capacity and prospects, the chancellor’s decision to assign John most of the couple’s debt — while awarding Amanda a car and some personal property to assist her efforts to realize self-sufficiency — was hardly an abuse of discretion.
II. Alimony
¶ 15. With respect to alimony, John raises one narrow legal issue. The dissent[6] constructs a series of substantially different arguments for John. We will first address the issue that John actually raised on appeal and then address the dissent’s contentions. ■
A. John’s Actual Argument on Appeal
¶ 16. John challenges the chancellor’s award of $2,900 in periodic alimony to Amanda. ., John does not challenge either the amount or the type of alimony awarded. Rather, he makes only a broad, one-page argument that “alimony should not have even been considered” for the sole reason that the chancellor’s equitable property division left him with a negative net worth but left Amanda with a positive net worth. After reciting the (deferential) appellate standard of review of alimony awards, John argues as follows:
• When issuing the ruling the trial judge stated: “So I’m going to have to come up with a figure, somewhere. But I’m going to go through the factors. I’m going to spell out if she’s entitled to alimony. Okay. I’m not supposed to even look at, that until we do a Ferguson evaluation. But when we look at a Ferguson situation, there’s not going to be anything there. The case law says I can’t look at the Armstrong factors or consider" them until we go through those.” When comparing Amanda’s assets and liabilities to those of John[], her net estate far exceeds that of John[], The court correctly found that all of the assets awarded to John by the court are subject to a federal tax lien. When an- equitable division of the marital estate has made adequate provision for-the spouses, there should be no award of alimony. Alimony should only be considered if the property division leaves one spouse in a deficit. The party left in a deficit here is John, since he is ordered to shoulder 100% of *282 the tax liabilities of the parties. 'Further, “[i]f there are sufficient assets to provide for both parties, then there is no more to be done.” Carter v. Carter, 98 So.3d 1109, 1112 (Miss.Ct.App.2012). John was effectively left with no estate, as everything he was awarded is encumbered by a federal tax lien that he has to pay. Since John therefore effectively has no estate left, Amanda’s estate exceeded John’s, and John was -saddled with 100% of the heavy tax debt, alimony should not have even been considered. The award of alimony should be reversed.
John’s Br. at 6-7 (emphasis by John;' citations omitted). That is John’s entire argument. It is not supported by any other citations to the record. Nor did John file a reply brief. With regard to alimony, the above paragraph is the entirety of the only argument he makes.
¶ 17. The argument is based on a misunderstanding of applicable precedents. It is true that alimony should not be considered unless the property division results in a “deficit” to one spouse. See, e.g., Seymour v. Seymour, 960 So.2d 513, 519 (¶ 16) (Miss.Ct.App.2006). But the “deficit” to which our cases refer is not one spouse’s receipt of assets with a lesser net value than those allocated to the other spouse. Rather, the question is whether the spouse seeking alimony is left “with- a deficit with respect to having sufficient resources and assets to meet his or her needs and living expenses.” Jackson v. Jackson, 114 So.3d 768, 777 (¶22) (Miss.Ct.App.2013) (emphasis added); accord, e.g., Pecanty v. Pecanty, 97 So.3d 1263, 1266 (¶¶ 19-20) (Miss.Ct.App.2012); Deborah H. Bell, Mississippi Family Law § 9.01[4][b], at 235 (2005).
(9] ¶ 18. Thus, an unequal division of property does not preclude an award of alimony when the chancellor finds that alimony is warranted based on an analysis of the Armstrong factors, including the parties’' respective incomes and expenses, fault, and the length of the marriage. See Pierce v. Pierce, 132 So.3d 553, 565 (¶ 30) (Miss.2014) (“[T]he chancellor must consider the [Armstrong ] factors in determining whether alimony should be awarded....”). For example, on comparable facts, we affirmed an alimony award even though the division of marital property greatly favored the wife, the husband’s income was significantly less than John’s, and the wife's income was slightly more than Amanda’s. See Seymour, 960 So.2d at 519-20 (¶¶ 13-17). The primary financial consideration was not that the wife was awarded more valuable marital property but that, despite “her share of the marital property,” her assets and post-divorce income were insufficient to cover her basic monthly expenses. See id. at 520 (¶ 17). Under those circumstances, we held that the chancellor did. not abuse his discretion in awarding alimony. See id.
¶ 19. Similarly, the chancellor in this case considered each of the Armstrong factors and concluded that an award of alimony was proper because, even taking into account the division of marital property, John’s income was sufficient to sustain his lifestyle, whereas Amanda’s income was insufficient to meet her expenses, even after she had moved back into her parents’ home. John does not challenge these factual findings, he does not address any of the Armstrong factors, and he does not challenge the amount or type of the award. Rather, his only argument is that “alimony should not have even been considered” for the sole reason that the chancellor had already assigned him far more of the marital debt than he assigned to Amanda. As Seymour plainly demonstrates, this broad argument fails. Even after the marital property division, Amanda was left “with a *283 deficit with respect to having sufficient resources and assets to meet ... her needs and living expenses.” Jackson, 114 So.3d at 777 (¶ 22). For the same basic reasons that the chancellor did not abuse his discretion in dividing the marital property, he also did not abuse his discretion by awarding Amanda alimony to address this continuing “deficit.”
B. The Dissent’s Arguments
¶20. As discussed above, John advanced only one narrow legal objection to the chancellor’s alimony award. His argument was only a page in length, and he challenged none of the chancellor’s underlying factual ■ findings. In contrast, the dissent, over the course of fifteen pages, has developed a series of arguments and alleged issues with thé award that are not even hinted at in John’s brief. The dissent also challenges findings of fact that John’s brief does not even- mention, let alone address.
¶21. The dissent’s approach is contrary to the general rule that we address only those issues raised by the parties themselves.' “This Court has no obligation to develop an appellant’s argument. Simply stated, we tmll not act as an advocate for one party to an appeal.” Roundstone Dev., LLC v. City of Natchez, 105 So.3d 342, 349 (¶34) (Miss.Ct.App.2011) (emphasis added), aff'd, 105 So.3d 317 (Miss.2013); see also Mack Trucks, Inc. v. Tackett, 841 So.2d 1107, 1117 (¶ 31) (Miss.2003) (“It is well established that an appellant must brief an issue for it to be reviewed on appeal.”).
¶22. Similarly, “[i]t is not this Court’s place to second-guess a chancellor’s findings when the parties have not;” In re Estate of Ladner, 909 So.2d 1051, 1056 (¶ 21) (Miss.2004). This Court should not be in the business of combing a 1,000-plus-page transcript for possible errors based on a single-page argument that no alimony should have been awarded. See Little v. State, 744 So.2d 339, 346 (¶28) (Miss.Ct.App.1999) (“It is not the obligation of this Court to independently search the record front fi> back to ferret out those facts that would bear on the issue.”).[7]
¶23. Moreover, an important purpose of the appellant’s brief is “to notify opposing counsel of the questions to be presented and the authorities relied on in reference thereto.” Dozier v. State, 247 Miss. 850, 851-52, 157 So.2d 798, 799 (1963). Because John did not raise these issues himself, Amanda has had no opportunity to respond to the dissent’s arguments. For all these reasons, the dissent’s arguments are not properly before the' Court.[8] Nonetheless, we will address them.
*284 1. The chancellor’s mid-hearing comments about alimony do not require automatic reversal.
¶24. The dissent cites two instances during the hearing in which the chancellor indicated that he was likely to or would award alimony. With little analysis, the dissent then declares that “[t]he alimony award should be reversed and remanded for this reason alone.” Post, at (¶ 58). This is not an argument that John made, and we are aware of no precedent establishing such a rule of automatic reversal.
¶ 25. To provide some additional context, the first comments quoted by the dissent occurred near the end of the fourth day of testimony in this matter (over 600 pages into the transcript). By this point, both John and Amanda had already testified and been cross-examined at length, and it was abundantly clear that their debts far exceeded their assets, that John had substantial income, and that Amanda’s income was insufficient to meet her living expenses. Based on this, the chancellor simply stated that although he had not “heard the whole case, ... from what [he had] heard so far,” he expected to award Amanda “some type of alimony.” He did so in the course of encouraging the parties to discuss settlement. It is true that alimony should be awarded only after the equitable division of property, and so perhaps the chancellor should' have been more circumspect in his comments. That said, the fact that,.tiie chancellor offered the parties his impressions of the first four days of testimony is hardly “plain error”[9] requiring automatic reversal.
¶ 26. The second comments quoted at length by the dissent came after the conclusion of all of the testimony and evidence (more than one thousand pages into the transcript), just before the chancellor took the case under advisement. The substance of these comments was essentially the same. The chancellor correctly stated that he was required to do a Ferguson (equitable property division) analysis before an Armstrong (alimony) analysis. But he observed that “when we look at Ferguson, there’s not going to be anything there” — i.e., the parties have a negative net worth. That being the case, and given Amanda’s income level, the chancellor intended to award alimony — as he put it, “[t]he only thing I can do is see you get by.” Again, the chancellor’s comments are hardly plain error requiring automatic reversal. These comments aside, the chancellor’s subsequent ruling from thé bench properly addressed property division first and then alimony after determining there was a need for it.
¶ 27. Finally, we note that the case that the dissent cites for its rule of automatic reversal, Williamson v. Williamson, 81 So.3d 262 (Miss.Ct.App.2012), is readily distinguishable. There, the chancellor did not merely discuss alimony before making an equitable division of the property but actually “[a]ccomplish[ed] the equitable division of the marital property by use of periodic alimony.” Id. at 270 (¶ 18) (emphasis added). We held that by fusing the two issues, the chancellor “confused the issue of the equitable division of the marital home and the issue of whether, after an equitable division of the marital property, [the] case warranted] alimony.” Id.
*285 There is no such confusion in the chancellor’s ruling in this case.
2. The chancellor adequately, considered “John’s ability to maintain a reasonably comfortable lifestyle for himself.” John was not “punished.” Amanda was not “rewarded” with an “affluent and unreasonable” lifestyle.
¶28. The dissent next asserts .that “the chancellor’s findings ,do not • touch on John’s ability to maintain a reasonably comfortable lifestyle for himself.” Post, at (¶ 59). Neither this argument nor the facts marshaled in support of it are found in John’s brief, and so Amanda’s brief does not contain a response. Nevertheless, we will touch on some of the record evidence that supports the chancellor’s award.
¶29. In the final updated Rule 8.05[10] form that he signed and filed with the court, John represented that he had a monthly gross income of $22,000 and a monthly net income of $13,420 from his work as an oilfield consultant. His previously filed 8.05s had reflected a gross monthly income of as much as $27,300. In any event, the final updated 8.05 reflects that John has a net (after-tax) annual income of over $161,000.
¶30. To be sure, John claimed that after-tax income of $161,000 was not enough to support-himself and pay debts and alimony, and the dissent apparently finds his testimony compelling. See post, at (¶ 63) (“John testified ...: T can’t do it. I could work every day 365 days a year and I still wouldn’t do it., I couldn’t do it. It’s not feasible for me to do it.’ ”). While the dissent apparently accepts John’s claim át face value, the chancellor was not required to do so. Some of John’s claimed needs are unnecessary or at least questionable — by way of example only, John claimed “maid” expenses of $250 pe!r month, and his earlier 8.05s claimed “entertainment” expenses of $850-per’month and “pet expenses” ranging from $750 to $1,150. And while John complains of the tax debts, which were no doubt substantial, John cited to no evidence regarding the ongoing monthly payments that would be required to pay them. Based on the evidence' presented at trial, we' cannot say that the chancellor manifestly erred in concluding that John could afford to and should pay periodic alimony.
¶ 31. Having accepted John’s claim that the chancery court has rendered him destitute, the dissent argues' that the award must have been intended to “punish” him and to “restore” Amanda to “her previous lifestyle.” See post, at (¶ 64). We are unable to infer such an intent from the chancellor’s ruling. While Amanda’s net income of about $800 per month plus $2,900 in periodic alimony will be sufficient to meet her reasonable living expenses, we fail to see. how it will restore her to an “affluent and unreasonable lifestyle,” as the dissent contends. Nor is there any evidence that the ruling was intended to “punish” John. The chancellor recognized that both parties were to blame for the tax debts[11] and simply assigned those debts to *286 the party with the earning capacity to pay them.
¶32. Finally, the dissent infers that Amanda really wanted rehabilitative alimony and thus argues that the chancellor should have awarded rehabilitative alimony, if anything. Post, at (¶¶ 66-68). However, Amanda specifically requested periodic .alimony both in her testimony and in pleadings.
3. The chancellor applied the Armstrong factors, he committed no abuse of his discretion, and John does not argue otherwise.
1133. The dissent next argues that “[t]he chancellor erroneously applied the Armstrong factors to the facts and evidence presented in this case.” Post, at (¶ 69). This is yet another argument that John does not make. In fact, John’s brief does not mention any of the Amstrong factors or any of the various sub-issues that the dissent raises under this heading.
¶ 34. It is also worth repeating that our standard of review on this issue is abuse of discretion. “As long as the chancellor follows [Armstrong’s], general standard, the amount of the award is largely within his discretion.” Klauser v. Klauser, 865 So.2d 363, 366 (¶ 10) (Miss.Ct.App.2003) (quoting Gray v. Gray, 562 So.2d 79, 83 (Miss.1990)). The chancellor’s underlying factual findings will not be set aside unless “clearly erroneous.” Id. at 366 (¶ 7) (emphasis added). So when the dissent asserts that the chancellor “erred” or “erroneously applied the Armstrcmg factors” or that a different type of alimony would be “more suited” for this case, it is not applying the correct standard of review.
¶ 35. Setting aside the fact that John waived this issue, and applying the correct standard of review, there is no basis for reversing. In his ruling from the bench, the court methodically discussed and considered each of the Armstrong factors. The dissent criticizes his apparent misstatement of Amanda’s age as 39 (post, at (¶ 70)), but he correctly stated her age (34 at the time) at the outset of his ruling. The misstatement is inconsequential, particularly since the chancellor also recognized that Amanda is in good health and has no medical condition that would prevent her from working. John obviously did not think the issue important or prejudicial, as his brief never even tells us Amanda’s age.
¶36. The dissent next argues that the chancellor erred by citing John’s having fathered a child with another woman as “fault or misconduct.” According to the dissent, this was error because the parties were already separated (though still married) at the time. Post, at (¶ 71). Regardless of whether this was error (John did not raise the issue), it was harmless because the chancellor’s primary basis for finding “fault or misconduct” was his prior ruling (which John does not challenge) that John was guilty of cruel and inhuman treatment of Amanda sufficient to justify a fault-based divorce. This was based on testimony and photographic evidence of a number of incidents of physical abuse and verbal abuse. Some of the abuse described was particularly degrad *287 ing and malicious. Amanda also testified that John falsely accused her of having sex with her brother and her first cousin. When she was unable to have a child despite undergoing fertility treatments, John told her that God was punishing her for some great sin. Suffice it to say, there was ample other evidence of fault or misconduct on John’s part. As such, the chancellor’s mention of John’s fathering a child with another woman while still married to Amanda was harmless, even if it was error.
¶ 37. The dissent says that “[t]he chancellor also erred by classifying John and Amanda’s [ten-year] marriage as a ‘long-term marriage.’ ” The dissent says we have classified this as a “moderate” length “at best.” Post, at (¶72) (citing Ericson v. Tullos, 876 So.2d 1088, 1039, 1041 (¶¶ 5, 11-12) (Miss.Ct.App.2004); Amacker v. Amacker, 33 So.3d 493, 498 (¶ 26) (Miss.Ct.App.2009)). Yet Ericson simply refers to a nine-year marriage as “of moderate length,” without further discussion of the issue. Ericson, 876 So.2d at 1041 (¶ 11). And Amacker notes that the chancellor deemed an eleven-year marriage “a midterm marriage that bordered on being a long-term marriage.” Amacker, 33 So.3d at. 498 (¶ 26). We said “this factor weighted] slightly in favor of’ the spouse requesting alimony. Id. In a recent case, we found no abuse of discretion in a permanent alimony award where the chancellor deemed an “almost” eleven-year marriage “to be a lengthy one by ‘today’s standards.’” Mamiaro v. Mamiaro, 179 So.3d 51, 58 (¶ 33) (Miss.Ct.App.2015) (Carlton, J., concurring in part and dissenting in part); see id. at, 52, 55 (¶¶ 1, 18-19) (majority op.) (finding no abuse of discretion).[12] Finally, in Rogillio v. Rogillio, 101 So.3d 150 (Miss.2012), the husband filed for divorce less than ten years into the marriage, and the Supreme Court held that “the chancellor did not abuse her discretion in finding that the length of the marriage favored [periodic] alimony.” Id. at 151, 155 (¶¶ 5, 21).
¶ 38. Calling a ten-year marriage a “long” one may be a stretch. It may be inaccurate. But given that the chancellor was well within his discretion in finding that the length of the marriage favored periodic alimony, id., the particular adjective he chose to describe that period of time cannot amount to reversible error. And it certainly is not plain error. John apparently did not think it was prejudicial or error at all — his brief never even tells us how long the parties were married.
¶ 39. “The chancellor must analyze an overall combination of the listed factors, ... not highlight[] a single category_” Hoggatt v. Hoggatt, 766 So.2d 9, 12 (¶ 9) (Miss.Ct.App.2000). The dissent’s quibbling with minor points in the chancellor’s thorough discussion of the Armstrong factors would not have amounted to an abuse of discretion even if John had raised the issue, which he did not.
III. Life Insurance
' ¶ 40. The chancellor also ordered John to maintain a $100,000 life insurance policy with Amanda as the beneficiary “to secure John’s [financial] obligations to Amanda” under the divorce judgment. John contends that the requirement that he maintain this life insurance policy was error because the periodic alimony — and, hence, his financial obligations to Amanda — would terminate upon his death.
¶ 41. At the outset, we note that John cites no relevant authority for *288 this contention, other than the general proposition that periodic alimony terminates upon the payor’s death. Nor does his half-page argument provide any meaningful analysis of the issue.. It is the appellant’s duty to provide relevant citations to authority and reasons to support his contentions, and if he fails to do so, the issue may be deemed abandoned. See McNeil v. Hester, 753 So.2d 1057, 1075 (¶65) (Miss.2000). Nonetheless, we address this argument and conclude that the life insurance provision of the judgment was not an abuse of discretion.
¶42. A spouse may be required to maintain s life insurance in an amount sufficient to satisfy financial obligations, including alimony, that would survive his death. See Coggins v. Coggins, 132 So.3d 636, 644 (¶ 35) (Miss.Ct.App.2014). And although periodic alimony payments do not vest until due and “terminate[ ] automatically upon the payor’s death” (at least “absent an express agreement” that provides otherwise), we have “[r]ecogniz[ed] the possibility that an alimony payor may fall behind in periodic-alimony payments and then die leaving those vested payments unsatisfied.” Id. at 644-45 (¶¶ 36-37). Therefore, a spouse may be required to maintain life insurance in an amount sufficient to cover some amount of periodic alimony. See id.
¶ 43. In this case, the divorce judgment imposed a number of obligations on John to pay fixed sums due 90 days, 120 days, one year, or two years from the entry of the judgment. By our calculations, these various obligations totaled approximately $68,000 due from John to Amanda. Most significant, this .included approximately $38,000 in attorney’s fees, with half due in one year and the other half due in two years. Thus, the $100,000 life insurance policy that John was ordered to maintain was sufficient to cover his fixed obligations under the judgment and approximately^ year of periodic alimony in addition. We do not consider this an abuse of discretion and therefore -affirm.[13] Compare with Coggins, 132 So.3d at 644-45 (¶¶ 33-38) (holding that an order requiring “insurance ... equivalent [to] thirty years worth of [periodic] alimony payments” was “excessive” and an abuse of discretion).
IV. Attorney’s Fees
¶44. The chancellor also awarded Amanda $38,085.93 in attorney’s fees after finding that the fees were reasonable based on the McKee factors[14] and that Amanda was.i unable to pay them herself. There was evidence that Amanda’s parents had paid $23,283.67 toward her fee bill, and Amanda testified that she was obligated to repay her parents but lacked the resources to do so.
¶ 45. John does not challenge the reasonableness of the fees; rather, he argues only that Amanda failed to prove her inability to pay. See, e.g., Dunn v. Dunn, 609 So.2d 1277, 1287 (Miss.1992) (a request for attorney’s fees generally requires proof of “inability to pay”). Yet Amanda testified as follows:
Q. ... [W]hat, if anything, would you have to do ... for your parents since they have loaned you that • money?
A. I have to pay every bit of that back.
*289 Q. ... And is there any way yon can pay that back?
A. No, sir.
¶ 46. John cites no evidence to contradict Amanda’s testimony but argues that it was insufficient to meet her burden of proof without further evidence of a written contract or her parents’ corroborating testimony. This,argument lacks,merit. The existence of an unwritten obligation “raises an issue -of fact,” and so we would not reverse the chancellor’s judgment even if there had been “sharply divergent testimony” on this point. Harris v. Williams, 43 So.2d 364, 365 (Miss.1949). We certainly will not do so given that Amanda’s testimony was uncontradicted.- John cites no authority suggesting that a divorcing spouse’s obligation to repay, his or her parents for money advanced for legal fees is subject to a heightened burden of proof. Indeed, in Armstrong,- the Supreme Court held that it was an abuse of discretion not to award fees based .on the wife’s uncon-tradicted testimony that she had to borrow funds from her parents to pay her lawyer. Armstrong, 618 So.2d at 1282.
¶ 47. Moreover, only a few weeks ago, in a unanimous decision, this Court similarly affirmed an- award of attorney’s fees that the wife’s parents had paid for her. See Branch v. Branch, 174 So.3d 932, 944-46 (¶¶ 55, 61) (Miss.Ct.App.2015). In fact, we affirmed in Branch despite the chancellor’s “omission [of] findings ” regarding the circumstances of “the payments of [the wife’s] attorney’s fees by her parents.” Id. at 945-46 (¶ 61) (emphasis added). We did so because “the chancellor accurately relied on the financial position of [the wife],” i.e¡, her own inability to pay. Id. In this case, as well, there was substantial evidence that Amanda lacked the resources to pay the fees. Accordingly, the chancellor did not abuse his discretion.
¶,48. The dissent echoes John’s attack on Amanda’s credibility. Post, at (¶ 82) (“I am- unpersuaded by Amanda’s testimo-ny_”).[15], The dissent contends that Amanda’s testimony was not credible, because her parents had given her and John gifts in the past. SpecificaEy, the dissent seems to imply that Amanda’s parents thought nothing of gifting her and John $25,000. To the extent--that the incident referenced is even relevant, the dissent has misunderstood . Amanda’s testimony about it. Amanda testified as follows: John -bought another horse that they could not afford over Amanda’s objections and “behind [her] back.” John’s unilateral, irresponsible purchase “left [them] with no money,” ” “[n]ot even enough to pay ... bills.” For this reason, Amanda had to ask her mom “to borrow” $2,500. Her mother misunderstood and loaned her $25,000 instead. Amanda realized the mistake, immediately repaid $22,500, and later repaid the rest of the money as well. We fail to see how Amanda’s previous repayment of money she borrowed from her parents contradicts her testimony that she was obligated to do the same with respect to, her attorney’s fees. The dissent identifies no basis for overturning the chancellor’s award, and as discussed above, both the Supreme Court and this Court have affirmed awards of attorney’s fees in *290 materially indistinguishable circumstances. See Branch, 174 So.3d at 944-46 (¶¶ 55, 61); see also Armstrong, 618 So.2d at 1282 (reversing the chancellor’s denial of attorneys fees and rendering a judgment for said fees).
¶ 49. Finally, we note that the dissent asserts, without elaboration or support, that the amount of attorney’s fees “appears excessive for a divorce case.” Post; at (¶ 79). As noted above, this case was heard on eleven different days over the course of many months. John vigorously litigated the division of property and the issue of alimony, among other matters. John has not challenged the hourly rates of Amanda’s lawyers, the time they spent on this matter, or the overall reasonableness of the fees they charges. Under the circumstances, there is no basis in the record for deeming their fees “excessive.”
¶ 50. For all of the above reasons, the chancellor’s findings related to attorneys fees were not “manifestly wrong.” Wood, 35 So.3d at 512 (¶ 8) (quoting Duncan, 774 So.2d at 419 (¶ 4)). In addition, the chancellor’s decision was based on “the appropriate standards,” and he did not abuse his discretion. Creekmore, 651 So.2d at 520. We therefore affirm the chancellor’s award of attorney’s fees to Amanda.
CONCLUSION
¶ 51. The chancellor did not abuse his discretion in equitably dividing the parties’ property, awarding alimony, requiring' the purchase of a life insurance policy, or awarding attorney’s fees. Accordingly, the judgment of the chancery court is affirmed in all respects.
¶ 52. THE JUDGMENT OF THE SIMPSON COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. JAMES, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, C.J.

. John has a child from a previous relationship, and he fathered a child with another woman during his separation from Amanda.

. John presented his case for divorce first, but the chancery court found that John failed to prove a fault-based ground for divorce.

. Ferguson v. Ferguson, 639 So.2d 921, 928 (Miss.1994).

. Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss.1993).

. The chancellor, did find that "John, because of his substantial income, has the ability to eventually work out from under [the tax liens] and taxes owed” — "unless he falls back into his previous reckless spending habits.” He found that "Amanda, on the other hand, could never pay these amounts based on the salary she will be able to earn.”. The chancellor’s assignment of the couple's tax debts to the spouse with the ability to pay them positively benefits "third parties,” Ferguson, 639 So.2d at 928, namely, taxpaying citizens.

. The separate opinion concurs with this opinion as to the equitable division of- the marital property only. Because our refer-enees to the separate opinion address its dissenting views, we refer to it as the dissent.

. Despite the length of the transcript, John's brief does not include the statement of facts required by Mississippi Rule of Appellate Procedure 28(a)(4). Thus, the dissent truly has had to "search the record front to back to ferret out ... facts” to support its arguments. Little, 744 So.2d at 346 (¶ 28).

. The dissent cites a pro se appeal from a decision of the Employment Security Commission in which we stated that it was "not necessary to consider” the pro se appellant’s one-page "argument unsupported by authority.” Routt v. Miss. Emp’t Sec. Comm’n, 753 So.2d 486, 487 (¶4) (Miss.Ct.App.1999). See Post, n. 17. Nonetheless, we opted to "examine the record and determine whether an error occurred,” we found that .the appeal was "without merit,” and we affirmed in a short opinion. Routt, 753 So.2d at 487-88 (¶¶ 1, 4). It is one thing to exercise our discretion to review a limited record on a claim for unemployment benefits, .and affirm on the merits despite the pro se appellant’s perfunctory brief. It would be quite another matter to reverse a chancellor’s reasoned judgment, rendered on a voluminous record following a lengthy trial, based on arguments and claims that the appellant's experiénced attorneys chose not to raise on appeal — arguments developed sua sponte after all briefs were filed, *284 so that the appellee has had no opportunity to respond. Again, “fs]imply stated, we will not act as an advocate for one party to an appeal.” Roundstone Dev. LLC, 105 So.3d at 349 (¶ 34) (emphasis added).

. See Miss. Real Estate Appraiser Licensing & Certification Bd. v. Schroeder, 980 So.2d 275, 289 (¶ 38) (Miss.Ct.App.2007) (discussing the requirements for recognizing "plain error”).

. UCCR8.05.

. The dissent, in contrast, seems to find greater fault with Amanda, - arguing that "John testified that Amanda managed the family money, handled their banking account, and wrote nearly all of the checks for the family. Amanda wrote the checks for ATVs, horses, vacations_" Post, at (¶ 62) (emphasis added). While the couple clearly spent significant sums that &ey could not afford on horses, Amanda testified, "[John] told me to [write the checks for the horses]. That was his money. He always made that very clear. It was his money. He earned it. And he could do what he wanted to with it.” She testified that she does not ride horses and that she "hated horses and hated going to [horse] shows.” There was similarly conflicting testi *286 mony about the ATVs and other vacations. Having heard all this testimony, the chancellor found that "John was the person who made the income and the decisions about what the money was spent for.” It is therefore unclear why the dissent places such stock in what "John testified” to. It is well established that such conflicts in the evidence and credibility determinations are for the chancery court, not this Court, to sort out. See, e.g., Irle v. Foster, 175 So.3d 1232, 1237-38 (¶¶ 21-24) (Miss.2015); McNeese v. McNeese, 119 So.3d 264, 275 (¶ 32) (Miss.2013); Powell v. Ayars, 792 So.2d 240, 243 (¶ 6) (Miss.2001).

. Interestingly, out in California a statute specifically provides that "a marriage of 10 years ... is a marriage of long duration.” Cal. Civ.Code § 4336(b).

. We also note that the judgment requires John to maintain coverage “until further order of [the chancery court].” If John makes timely payment of the fixed sums due under the judgment, including attorneys’ fees, and remains current on his alimony obligations, we assume that the court will consider a reduction or even elimination of this requirement at some point in the future.

. McKee v. McKee, 418 So.2d 764, 767 (Miss.1982).

. But see Irle, 175 So.3d at 1237-38 (¶ 23) (“[W]ith respect, .the dissent is without .authority to decide what the disputed testimony shows. That power, lies with the chancellor alone, who sat as the fact-finder and heard the testimony firsthand.” (brackets, quotation marks omitted)); McNeese, 119 So.3d at 275 (¶ 32) (“This Court gives deference to a chancellor's findings in regard to witness testimony, because the chancellor is able to observe and personally evaluate the witnesses’ testimony and the parties’ behavior.”); Powell, 792 So.2d at 243 (¶ 6) ("It is for the chancellor to determine the credibility and weight of evidence.”).