# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-01246-COA

RONNIE ALI                                                                              APPELLANT

v.

AMY KAYE TOWNSEND ALI                                                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 06/17/2015 |
| TRIAL JUDGE: | HON. JAMES B. PERSONS |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | DEAN HOLLEMAN |
| ATTORNEYS FOR APPELLEE: | EARL L. DENHAM |
| | PHILLIP LANE NORWOOD |
| | MATTHEW PAUL PAVLOV |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | DIVORCE AWARDED; ALIMONY, VISITATION ORDERED |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART: 06/13/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., FAIR AND WILSON, JJ.**

**FAIR, J., FOR THE COURT:**

¶1.     Dr. Ronnie Ali, 49, and nurse practitioner Amy Ali, 27, were married in 2003 and had a child together a few months later. They separated after almost seven years of marriage, and Amy filed for divorce.

¶2.     Over the next several years they filed more than two hundred pleadings, with Amy filing the lion's share. The trial was bifurcated due to complex financial issues, especially those relating to several "urgent care" medical clinics owned by the couple. On March 7,

2013, Amy was granted a divorce on habitual cruel and inhuman treatment grounds. The remaining issues were tried over twelve days in February and March of 2014. A year later the chancellor entered a detailed twenty-six-page decision, dividing the parties' property and awarding Amy custody of the minor child, child support, and alimony.

¶3. Ronnie states in his brief that though he feels the chancellor erred in the equitable distribution, he "chooses" not to challenge it. Visitation, child support, alimony, attorney's fees, and life insurance remain at issue on appeal. We conclude that the chancellor applied the correct legal standards and acted within his discretion in awarding child support, alimony, and attorney's fees. Those awards must be affirmed. We remand, however, on the issues of visitation and insurance.

## STANDARD OF REVIEW

¶4. "When [an appellate court] reviews a chancellor's decision in a case involving divorce and all related issues, [the court's] scope of review is limited by the substantial evidence/manifest error rule." *Yelverton v. Yelverton*, 961 So. 2d 19, 24 (¶6) (Miss. 2007). A chancellor's factual findings will not be disturbed unless manifestly wrong or clearly erroneous, or an erroneous legal standard was applied. *Carambat v. Carambat*, 72 So. 3d 505, 510-11 (¶24) (Miss. 2011). As long as substantial evidence supports the chancellor's findings, an appellate court is without authority to disturb them, even if it would have found otherwise as an original matter. *Joel v. Joel*, 43 So. 3d 424, 429 (¶14) (Miss. 2010). Additionally, if the chancellor has made no specific findings of fact, we generally "proceed

2

on the assumption that he resolved all such fact issues in favor of the appellee." *Ferrara v. Walters*, 919 So. 2d 876, 881 (¶8) (Miss. 2005) (citation omitted). Questions of law, on the other hand, are reviewed de novo. *Irving v. Irving*, 67 So. 3d 776, 778 (¶11) (Miss. 2011).

**DISCUSSION**

### 1. Visitation

¶5. The chancellor's final judgment contained no express order for permanent holiday or summer visitation, though it at times appears to presuppose they had been awarded.[1] On appeal, Ronnie contends this was error; and Amy concedes that it appears to be an oversight that should be clarified on remand to the chancery court. As this issue is conceded, we remand to the chancery court to clarify the visitation order.

### 2. Alimony

¶6. Ronnie submits in his brief that the periodic alimony award, $5,500 per month, is not appropriate in this case because "there was absolutely no disparity in Amy's financial position as compared to Ronnie's horrific financial position" after the equitable division. While he does not directly challenge the division, he nevertheless urges that, in mathematical terms, Amy received more value in the property division (approximately $390,000) than the net value of the marital estate (approximately $280,000), and significantly more than his net

---

[1] For example, the judgment specifies an exchange point for "weekend and holiday visitation." In addition, a detailed visitation order for both weekend and holiday visitation was entered on June 14, 2013, expanding and providing details set out in an earlier visitation order.

3

deficit after property division, attorney's fees, and litigation expenses (which he puts at $417,000). Ronnie also points to Amy's income of $6,000 per month as a nurse practitioner prior to the marriage, as well as income she could expect as owner of an urgent care clinic awarded to her in equitable division. Ronnie submits that Amy is capable of supporting herself.

¶7. The chancery court has broad discretion in deciding whether to award alimony and in what amount. *Pearson v. Pearson*, 761 So. 2d 157, 165 (¶25) (Miss. 2000). "[Appellate courts] will not disturb the award on appeal unless it is found to be against the overwhelming weight of the evidence or manifestly in error." *Id.*

¶8. Ronnie acknowledges that the issues of property division and alimony are "intertwined." *McKissack v. McKissack*, 45 So. 3d 716, 723 (¶41) (Miss. Ct. App. 2010). "All property division, lump sum or periodic alimony payment, and mutual obligations for child support should be considered together. Alimony and equitable distribution are distinct concepts, but together they command the entire field of financial settlement of divorce. Therefore, where one expands, the other must recede." *Ferguson v. Ferguson*, 639 So. 2d 921, 929 (Miss. 1994) (citation and internal quotation marks omitted).

¶9. In the equitable division, Amy's award mostly consisted of the marital home (approximately $187,000 in equity), household furnishings, three vehicles ($27,000), about $18,000 in checking and savings accounts, a $28,000 IRA, and one of the urgent care clinics owned by the parties ($111,000). Ronnie received the other functioning urgent care clinic,

4

another one that was apparently defunct, about $62,000 in gold coins and savings accounts, his personal corporation ($32,000), and other personal assets – for a grand total of $266,000. Ronnie's claims of a large net deficit in total awards are premised on his comparing his distribution of the marital assets with the marital debt ($376,500, of which $358,000 was delinquent taxes and penalties the chancellor attributed to Ronnie's misconduct) and litigation expenses, including his and the half of Amy's attorney's fees he was ordered to pay.

¶10.    The marital estate was disproportionately small compared to Ronnie's income.  His adjusted gross income on his Uniform Chancery Court Rule 8.05 financial statement was $41,463.00 per month after deducting federal and state income taxes of $19,668.76 per month (32.17%).  At trial, Ronnie boasted he could earn $900,000 per year when he needed the money.  Amy, on the other hand, had worked little since the marriage, dividing her time between caring for the child and managing the parties' urgent care clinics.  The clinics were not particularly valuable or profitable, despite the energy and money the parties had invested in them.  The chancellor noted that he would have preferred to award Amy both of the remaining clinics, but Ronnie had entangled one with another business owned by his family.  The chancellor also found that Ronnie had systematically violated "court orders regarding child and spousal support, payment of the mortgage, taxes, and insurance associated with the marital home as well as the transition of clinic management to [Amy] . . . [and] the use of clinic funds without [Amy's] approval or court order," which had resulted in Amy's filing a plethora of contempt pleadings.

5

¶11. Following a detailed discussion of the *Armstrong*[2] factors, the chancellor awarded Amy $5,500 per month in periodic alimony. On appeal, Ronnie contends that the chancellor erred in finding a deficit following the property division and failed to consider Amy's earning potential and Ronnie's reasonable expenses.

¶12. The question of a deficit is "with respect to having sufficient resources and assets to meet . . . needs and living expenses." *Layton v. Layton*, 181 So. 3d 275, 282 (¶17) (Miss. Ct. App. 2015) (quoting *Jackson v. Jackson*, 114 So. 3d 768, 777 (¶22) (Miss. Ct. App. 2013)). As the Mississippi Supreme Court has said, "a financially independent spouse may be required to support the financially dependent spouse in the manner in which the dependent spouse was supported during the marriage, subject to a material change in circumstances." *Rogillio v. Rogillio*, 57 So. 3d 1246, 1250 (¶11) (Miss. 2011).

¶13. Ronnie undoubtedly supported Amy during the marriage, but he contends on appeal that the chancellor failed to consider Amy's ability to earn income as a nurse practitioner, as well as the earnings from the urgent care clinic she was awarded. But, in fact, the chancellor addressed both directly in his opinion and judgment; he concluded that Amy's prospects were uncertain after a long hiatus from paid employment, and that she "will be left with a significant deficit even if she were to eventually obtain employment as a nurse practitioner."

¶14. We also find no merit to Ronnie's claims that there was no disparity following the property division – although it is true that Amy received much of the marital property, the

---

[2] *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993).

6

marital estate was illiquid, relatively small, and could not produce income sufficient to support Amy as she was supported during the marriage. We are likewise unimpressed with Ronnie's contentions regarding the chancellor's findings of his misconduct and dissipation of marital assets; his argument is perfunctory and his contentions are often disingenuous or contradicted by other evidence in the record. As an example, Ronnie argues that the chancellor erred in finding that he had systematically violated the temporary order to pay the mortgage on the marital home by pointing out that he did, in fact, pay the mortgage – but it would be more accurate to say that Ronnie eventually paid the mortgage, as many of the payments were late. Similarly, Ronnie claims that the delinquent taxes were a result of an error by his preparer, but the only record evidence he cites in support of this claim is testimony from a different accountant that the taxes were done incorrectly. Ronnie fails to mention that his accountant from the relevant time also testified at trial – that Ronnie had instructed her to stop making the tax payments, that she had resisted, and that she had considered herself terminated following the disagreement. Finally, Ronnie points out that the chancellor never entered an order finding him in contempt, but he does not explain how that is relevant to the chancellor's ultimate findings.

¶15.    Ronnie also suggests that the alimony award denies him sufficient income to maintain a reasonable standard of living, but he provides no substantive argument in support. His claimed monthly expenses – approximately $43,000 – consist largely of the temporary support awards and short-term debt service, particularly the delinquent taxes, which by

7

themselves accounted for almost one-third of Ronnie's claimed monthly expenses. It would be grossly inequitable to allow Ronnie to avoid paying alimony by wrongfully incurring temporary obligations. It is also worth noting that the chancellor's order allows Ronnie to deduct the alimony from his annual taxable income of $733,584. Thus a monthly alimony payment of $5,500 will actually cost him no more than $3,538. Amy must pay the taxes, though at a lesser rate than Ronnie.

¶16. The chancery court has broad discretion in determining whether to award alimony and in what amount. Ronnie has failed to show an abuse of that discretion here.

### 3. Attorney's Fees

¶17. Next, Ronnie challenges the chancellor's order requiring him to pay one-half of Amy's attorney's fees, which amounted to approximately $144,500. Ronnie argues at length that Amy was able to pay her own fees, but his efforts are misdirected – while the chancellor did find that Amy could not pay her own attorney's fees, the award was clearly based on Ronnie's misconduct, not on Amy's inability to pay. On this point, Ronnie presents little argument and no authority. "The appellant's failure to cite relevant authority obviates the appellate court's obligation to review such issues." *Jones v. State*, 203 So. 3d 600, 605 n.1 (Miss. 2016).

### 4. Child Support

¶18. The chancellor awarded Amy $5,000 per month in child support for the single child, who was eleven years of age at the time of the judgment. The award was approximately 12%

of Ronnie's adjusted gross monthly income.

¶19.   On appeal, Ronnie bases his argument on an incorrect reading of Mississippi's child support guidelines.  He seems to assume that the presumptively correct child support amount for one child is 14% of the first $100,000 per year in adjusted gross income, or roughly $1,167 per month – period.  But that is simply not what the statute provides.  Mississippi Code Annotated section 43-19-101(4) (Rev. 2015) states, in relevant part:

> In cases in which the adjusted gross income as defined in this section is more than One Hundred Thousand Dollars ($100,000.00) . . . , the court shall make a written finding in the record as to whether or not the application of the guidelines established in this section is reasonable.

If the "14% of all net income for one child" guideline was blindly applied to all of Ronnie's 8.05 net income, the monthly amount of support to be paid to Amy for his one child would be $5,810 per month.  *See id.* § 43-19-101(1).  Thus, if the chancellor deviated from the guideline, it was to reduce Ronnie's obligation rather than increase it.  But the chancellor did not deviate from the guideline; he found it inapplicable.

¶20.   In the chancellor's written judgment, he expressly noted that the guidelines did not presumptively apply to higher incomes and that the court was required to make a written finding as to whether their application was reasonable.  The court then noted approximately $2,000 per month had been spent on schooling, tutoring, and various other activities for the child, before setting monthly child support from Ronnie at $5,000 per month.  Again, this was approximately 12% of Ronnie's adjusted gross income.

¶21.   On appeal, Ronnie claims that this figure is unreasonable, but he provides no

9

convincing argument. "In determining child support, chancellors may consider, inter alia, the health, income, and earning capacity of both parents, the reasonable needs of the child, and the necessary living expenses of the noncustodial parent." *Barnes v. Dep't of Human Servs.*, 42 So. 3d 10, 18 (¶32) (Miss. 2010) (Waller, C.J., concurring in part and in the result) (citation omitted). Ronnie's principal argument is that the amount is excessive to provide the child with "reasonable" support. He notes that many children – indeed many families – make do with less, though this flies in the face of Ronnie's testimony at trial as to how he believed the child should be supported and his claimed expenses relating to the child; on his Rule 8.05 financial statement, he claimed expenses of $1,000 per month just for entertaining the child during visitation. We reject the argument that equates reasonable support with subsistence and instead agree with the chancellor that the "reasonable needs" of the child ought to be viewed at least as broadly as the reasonable needs of a wife seeking alimony. It is not an abuse of discretion for the chancellor to consider the standard of living to which the child is accustomed in deciding what amount of support is reasonable. *See Moulds v. Bradley*, 791 So. 2d 220, 228-29 (¶24) (Miss. 2001) (Diaz, J., concurring). The chancellor thoroughly considered this issue and provided sound reasons for his decision. We can find no abuse of discretion in the amount of the award.

### 5.    Insurance

¶22.    The chancellor ordered Ronnie to maintain a life insurance policy valued at $2 million, with Amy to receive $1.5 million and the minor daughter to receive $500,000 in the

10

event of Ronnie's death. On appeal, Ronnie argues that the policy amounts required for Amy are excessive in light of the permissible purposes of such awards. We agree.

¶23. In *Coggins v. Coggins*, 132 So. 3d 636, 644-45 (¶¶35-37) (Miss. Ct. App. 2014), this Court explained:

> An alimony payor "may be required to maintain life insurance in an amount sufficient to satisfy payment of alimony obligations that survive the payor's death." [Deborah H.] Bell, *Mississippi Family Law* § 9.08[4][c] [(2005)] (citing *In re Estate of Hodges*, 807 So. 2d 438, 442-44 (¶¶14-23) (Miss. 2002)). The key phrase is "alimony obligations that survive the payor's death."
>
> Periodic alimony is an obligation that "terminates automatically" upon the payor's death and cannot be imposed upon the payor's estate, absent an express agreement. *Armstrong* [*v. Armstrong*, 618 So. 2d 1278, 1281 (Miss. 1993)]; *see In re Hodges*, 807 So. 2d at 443 (¶19). While lump-sum alimony fully vests at the time of the divorce judgment, periodic alimony only vests on the date each payment becomes due. *In re Hodges*, 807 So. 2d at 442 (¶17). So when the payor dies, the only alimony obligations that survive—and the only obligations that may be insured—are unpaid lump-sum alimony and unpaid periodic-alimony payments that have already vested.
>
> Recognizing the possibility that an alimony payor may fall behind in periodic-alimony payments and then die leaving those vested payments unsatisfied, this court has acknowledged the chancellor's authority to require the alimony payor to maintain a life-insurance policy to protect the recipient spouse against such a contingency. [*Johnson v. Pogue*, 716 So. 2d 1123, 1134 (¶41) (Miss. Ct. App. 1998)]; *see also Beezley v. Beezley*, 917 So. 2d 803, 808 (¶17) (Miss. Ct. App. 2005). But in *Pogue*, this court found that requiring the payor to maintain a $75,000 life-insurance policy to protect against the potential failure to make $500-per-month alimony payments was "excessive." *Pogue*, 716 So. 2d at 1134 (¶41).

¶24. Given the standard we have just recited, it is impossible to say that a life insurance policy of $1.5 million is necessary to guard against the potential failure to make $5,500 monthly alimony payments and to repay approximately $376,500 in marital debt. On

11

remand, the chancery court should determine an appropriate award in light of the authorities we have just discussed.

¶25. **THE JUDGMENT OF THE CHANCERY COURT OF HARRISON COUNTY, FIRST JUDICIAL DISTRICT, IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**GRIFFIS, P.J., BARNES, ISHEE, CARLTON AND GREENLEE, JJ., CONCUR. WILSON, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. LEE, C.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY IRVING, P.J., AND WESTBROOKS, J.**

**LEE, C.J., CONCURRING IN PART AND DISSENTING IN PART:**

¶26. Because I find that the chancellor abused his discretion in awarding periodic alimony to Amy, I respectfully dissent in part. In light of the length of the marriage and Amy's ability to earn a living, the chancellor's alimony award was excessive. I do concur with the majority's decision to affirm on the issues concerning attorney's fees and child support and to remand on the issues concerning visitation and insurance.

¶27. First, the award of alimony was excessive, and the chancellor did not give adequate consideration to Ronnie's monthly expenses. In determining the amount of support payable to the wife, a chancellor must consider not only the reasonable needs of the wife but also the right of the husband to lead as normal a life as reasonably possible. *Davis v. Davis,* 832 So. 2d 492, 497 (¶19) (Miss. 2002) (citation omitted). Here, Ronnie's monthly expenses, including his current support obligations to Amy, exceed his monthly gross income by

12

approximately $2,400. The chancellor did not consider the appropriateness of the award in relation to Ronnie's payments for child support and all marital debts and liens, which were assessed solely to him. The chancellor should have considered Ronnie's "other financial obligations and his ability to maintain a decent standard of living." *Ewing v. Ewing*, 203 So. 3d 707, 716 (¶30) (Miss. Ct. App. 2016). Because Ronnie's monthly expenses, including his support obligations, exceed his gross monthly income, the chancellor's alimony award was "per se unreasonable." *Brooks v. Brooks*, 652 So. 2d 1113, 1122 (Miss. 1995).

¶28.    Further, the parties were only married for seven years before Amy filed for divorce. This Court and the Mississippi Supreme Court have classified marriages of much longer duration as "mid-term" and "moderate-length" rather than long-term in the context of alimony awards. *See Layton v. Layton*, 181 So. 3d 275, 296-97 (¶72) (Miss. Ct. App. 2015) (James, J., concurring in part and dissenting in part); *Amacker v. Amacker*, 33 So. 3d 493, 498 (¶26) (Miss. Ct. App. 2009); *Ericson v. Tullos*, 876 So. 2d 1038, 1039, 1041 (¶¶5, 11-12) (Miss. Ct. App. 2004); *Mabus v. Mabus*, 890 So. 2d 806, 823 (¶68) (Miss. 2003). Alimony is not a bounty to which Amy became entitled to receive indefinitely simply because, at one time, she was married to Ronnie. *Beacham v. Beacham*, 383 So. 2d 146, 148 (Miss. 1980). Here, the length of the marriage did not favor awarding Amy periodic alimony.

¶29.    Finally, Amy's potential earning capacity should have weighed against an alimony award. Amy is a licensed nurse practitioner and, prior to the parties' separation, managed an urgent care clinic for years. But the chancellor concluded that Amy's earning capacity as

13

a nurse practitioner was "uncertain" as she had not worked as a nurse practitioner for approximately ten years, and therefore awarded her periodic alimony in the amount of $5,500 per month. However, the record demonstrates that Amy's earning capacity is enough to meet her reasonable needs. Perhaps an award of rehabilitative alimony would have been more appropriate since Amy had not worked as a nurse practitioner for ten years.

**IRVING, P.J., AND WESTBROOKS, J., JOIN THIS OPINION.**