# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00593-COA

SARAH ANDERSON (GRABMILLER)                                    APPELLANT

v.

JOSHUA GRABMILLER                                              APPELLEE

DATE OF JUDGMENT:                03/22/2023
TRIAL JUDGE:                     HON. CHARLES E. SMITH
COURT FROM WHICH APPEALED:       LAUDERDALE COUNTY CHANCERY
                                 COURT
ATTORNEYS FOR APPELLANT:         MARTY CRAIG ROBERTSON
                                 SARAH HUNTER DIDLAKE
                                 JOHN S. GRANT IV
ATTORNEY FOR APPELLEE:           WILLIAM B. JACOB
NATURE OF THE CASE:              CIVIL - DOMESTIC RELATIONS
DISPOSITION:                     AFFIRMED - 09/17/2024
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., SMITH AND EMFINGER, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     Sarah Anderson and Josh Grabmiller both filed for divorce in February 2021 in the

Chancery Court of Lauderdale County. They subsequently agreed to a divorce on the ground

of irreconcilable differences. They agreed on certain issues, and they submitted other issues

to the chancellor for resolution. Relevant to this appeal, Anderson and Grabmiller submitted

the following issue: "The amount, duration, and form of alimony, if any, to be paid by one

party to the other." On March 22, 2023, the chancery court issued its final judgment of

divorce ordering Sarah to "pay monthly periodic alimony to Josh in the amount of $1,000.00,

beginning April 1, 2023." The chancery court denied Sarah's post-trial motion to alter or

amend the judgment with respect to the alimony issue.

¶2.     Sarah appeals only with respect to the alimony issue, asserting that (1) the chancellor erred by failing to analyze or consider rehabilitative alimony as an alternative to periodic alimony; and (2) the chancellor erred by failing to apply the *Armstrong* factors[1] to decide the proper type of alimony (rehabilitative or periodic) and by failing to consider whether any of the factors supported rehabilitative alimony.

¶3.     For the reasons addressed below, we affirm the judgment of the chancery court.

**PROCEDURAL HISTORY AND STATEMENT OF FACTS**

¶4.     Sarah and Josh were married on December 28, 2008, and have two minor daughters, E.R. and S.L.[2]  Sarah and Josh each filed separate complaints for divorce in February 2021. The two matters were consolidated.  On March 25, 2021, the chancery court issued an "Order Granting Temporary Relief" in which the court awarded Sarah temporary physical and legal custody of the children and delineated a visitation schedule.  The chancery court also ordered, as follows:

> Sarah shall pay temporary monthly spousal support of $2,000.00.00 [sic] to Joshua beginning on April 1, 2021.  Joshua shall pay temporary monthly child support to Sarah in the amount of $400.00 per month, beginning on April 1, 2021. With  the requirement of both to pay support to each other, the above amounts shall be off set, with Sarah being required to pay to Joshua the amount of $1,600.00 each month.

¶5.     Sarah and Josh eventually agreed to a divorce on the ground of irreconcilable differences.  They also filed a "Consent to Adjudicate" in which they "request[ed] the Court

---

[1] *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993).

[2] Initials are used to protect the children's privacy.

2

to decide the matters upon which they cannot agree." Concerning this appeal, the consent to adjudicate specifically requested that the chancery court determine "[t]he amount, duration, and form of alimony, if any, to be paid by one party to the other."

## I.     The March 2023 Trial

¶6.     A three-day trial was held on March 6-8, 2023, to address the issues listed in the consent to adjudicate. Josh testified and called his mother as a witness. Sarah testified and called her mother as a witness. Fifty-eight exhibits were admitted into evidence.

¶7.     At the time of trial, Josh was forty-one years old, and Sarah was thirty-nine. E.R. was nine, and S.L. was five. Sarah testified that after completing her undergraduate degree, she moved from Mississippi to Georgia to attend the Philadelphia College of Osteopathic Medicine ("DO school") in Suwanee, a suburb of Atlanta, Georgia. Sarah met Josh while she was attending DO school. Sarah and Josh married on December 28, 2008, near the end of Sarah's second year.

¶8.     Josh has a high school diploma and has taken some college courses. When Sarah and Josh married, Josh was working at TGC, a family business formed to install video equipment in smart houses. Later, the business began selling DVDs on eBay and Amazon. About six months before Sarah completed DO school, Josh was laid off from his job.

¶9.     Sarah graduated from DO school in 2011. After DO school, Sarah and Josh moved to Tupelo for Sarah to complete her residency in family medicine at North Mississippi Medical Center. Sarah and Josh lived in Tupelo for about three years. When they moved to Tupelo, they purchased a house that needed updating, so Josh painted and did other repair

3

work to the home for the first three to six months that they lived there. Then Josh got a sales job at Terminix. Josh testified Terminix paid him $45,000 a year.

¶10. In August 2013, Sarah and Josh had their first child, E.R., during Sarah's third year of residency. After Sarah finished maternity leave, Josh resigned from Terminix to stay home with E.R.

¶11. After Sarah's residency, in July 2014, Sarah and Josh moved to Meridian for Sarah to work at Rush Medical Group (Rush). Sarah and Josh purchased a home from Sarah's grandfather that required extensive renovation. Josh testified that they agreed he would "be the stay-at-home parent while [Sarah] worked, and then [he] was going to continue to work on the house as well during [his] free time." Josh testified about the scope of the renovation, explaining that "[w]e're talking about a 3,500 square foot house that needed to be completely gutted and renovated, and toilets removed on slab foundations because Sarah wanted me to. So this wasn't . . . a cookie-cutter remodel." Sarah testified that "[she] wanted to buy [her grandfather's] house . . . [and that] she wanted updates done. And so, the plan was . . . that [Josh] would work on those updates and then he would transition into employment." The parties' second daughter, S.L., was born in August 2017.

¶12. Updates to the home were still incomplete when Josh and Sarah both separately filed for divorce in February 2021. Josh said that the remodeling was not completed because "[i]t was a lot to do." He testified that "[i]t's hard to remodel when you're having to take care of the family, too; pick up the kids from school, drop them up; pick them up from dance, drop them off; cook, clean and go b[u]y the groceries. I was in charge of the finances as well."

4

¶13. When Sarah first started working at Rush, she had a traditional family medicine practice where she was required to be on call. Sarah testified she enjoyed this type of work, but it "took [her] away from [her] kids and made [her] miss things that [she] didn't want to miss." After about six months, Sarah switched jobs and began working with the family medicine residency program in Meridian. Sarah said that by the time S.L. was born in August 2017, she was the associate program director.

¶14. Sarah testified that she had approximately $300,000 in student loan debt. According to Sarah, "the plan was always that I was going to work, and as soon as my student loans were paid off, that my workload would be cut back so that I could focus on being a mother." She said at that point, "Josh was going to get a job and a job [where] [h]e had benefits so that he could provide for insurance and that I could cut back to part time, in order to be with the girls more." Sarah testified it took her five years to pay off her student loan debt; she was able to do this by picking up moonlighting shifts in the emergency room at Stennis Hospital.

¶15. In 2019, Sarah paid off her student loans. She said that once the student loans were paid off, she and Josh discussed that they needed to "get [their] finances in line," so they met with a financial planner to discuss their retirement. Based on information provided by Sarah and Josh at the meeting, the financial planner prepared a "Wealthcare Guide Financial Plan" dated September 2020. The Wealthcare financial plan indicated that one of their goals was "to allow Sarah to reduce her workload and/or change jobs in about five years." During cross-examination, Josh acknowledged that he and Sarah told the financial planner that they planned that he "was going to go back to work and pursue a career." The Wealthcare

5

financial plan shows that an "[a]ssumption" with respect to the parties' income was that Josh would have "[r]ealtor [e]arnings" of approximately $50,000 per year from "2022-retirement." Following the meeting with the financial planner, Sarah and Josh both opened IRAs. Sarah funded both accounts. Sarah and Josh also purchased life insurance policies.

¶16. Regarding childcare, when Sarah and Josh moved to Meridian in July 2014, E.R. began attending daycare. Josh testified that S.L., who was born in August 2017, was placed in daycare "for a short while" before the COVID-19 pandemic shut down schools in early 2020. He said that "we wanted [S.L.] to go to daycare. It was time for her to go to daycare . . . . My job was to renovate the house at that time." Once E.R., their older daughter, began school, she went to daycare for at least one summer break.

¶17. Josh testified that in his free time he made do-it-yourself (DIY) videos and posted them on YouTube "as a hobby." He said he created his YouTube channel about two years before his separation from Sarah and acknowledged that he did not make any kind of substantial income from the YouTube videos.

¶18. The chancery court found that Josh and Sarah "separated as husband and wife" in August 2019, although Josh testified he and Sarah were still living in the same house when they filed their divorce actions in February 2021. At the beginning of the COVID-19 pandemic, the two girls stayed home with Josh. E.R. attended virtual school during this time. Sarah testified that she often came home and found the virtual schoolwork had not been completed. Around January 2021, Sarah made arrangements with her mother for E.R. to go to her house after school or if there was a virtual school day. Sarah's mother would then help

6

E.R. with her schoolwork. S.L. attended daycare during this same time. Sarah would pick up S.L. every day on her way home from work.

¶19. During cross-examination, Josh acknowledged that he withdrew $30,000 from the family checking account at the time of the separation. He testified he considered it family funds because although Sarah earned the money, "I allowed her to earn it by doing what I was doing at home by taking care of everything on the back end while she worked. It was equal employment."

¶20. As noted, Josh and Sarah both separately filed for divorce in February 2021, and the cases were later consolidated. The chancery court found that as of February 11, 2021, when each party filed for divorce, the home remodeling and addition work had not been completed.

¶21. After filing their complaints for divorce, both Josh and Sarah filed motions for temporary relief. The chancery court issued an "Order Granting Temporary Relief" on March 25, 2021, granting Sarah temporary physical and legal custody of both children. Josh was granted visitation on the second, fourth, and fifth weekends of each month, as well as summer and holiday periods. Sarah was granted temporary use of the marital home; Josh was granted temporary use of the cabin. As noted, Sarah was also ordered to pay temporary monthly spousal support of $2,000 to Josh beginning on April 1, 2021, and Josh was ordered to pay temporary monthly child support to Sarah in the amount of $400 per month, beginning on the same date. Sarah testified at trial that as of the time of trial, she had paid Josh $2,000 for the last twenty-four months ($48,000) in temporary alimony since the temporary hearing. During that same time period, Sarah received $400 per month ($9,600) in child support from

7

Josh.

¶22. After the temporary order was entered, Josh obtained employment with Clearspan Components (Clearspan) in Meridian doing industrial maintenance. He was still working at Clearspan at the time of trial in March 2023. The chancery court found he has monthly disposable income of $2,995 per month, as shown by his Rule 8.05 financial disclosures. *See* UCCR 8.05. Josh testified that his work schedule is 6:00 a.m. to 4:00 p.m. Monday-Thursday and 6:00 a.m. to 2:30 p.m. on Friday. He also may work the Saturdays when he does not have the children.

¶23. The chancellor found that Sarah works as a family physician in a clinic and has monthly disposable income as shown on her Rule 8.05 financial disclosures of $12,969. Sarah testified that her work schedule is 8:00 a.m. to 4:00 p.m. Monday through Thursday and 8:00 a.m. to 12:00 p.m. on Friday.

¶24. At the end of the three-day trial, after both parties rested, the chancellor specifically asked the parties' counsel whether either one of them "want[ed] to take time for any argument." Both lawyers said they did not. The chancellor then said he would go through the evidence presented and render a written opinion soon.

## II. The Chancery Court's Memorandum Opinion and Final Judgment of Divorce

¶25. The chancellor entered his memorandum opinion and the final judgment of divorce on March 22, 2023. Regarding custody, the chancellor found that "the best interest of the children [would] be served by granting Sarah physical custody and the parties being granted joint legal custody." The order detailed a visitation schedule, and Josh was ordered to pay

8

$600 per month in child support.

¶26. The chancellor then addressed the equitable division of property. He noted that the parties agreed to the division of their real property through their stipulations in the consent to adjudicate. Sarah would get the exclusive title, use, and possession of the marital home, and Josh would get the exclusive title, use, and possession of the cabin. The parties also agreed that each party would retain the use of their own vehicle, with both vehicles being valued at about $7,000. The chancery court found that the accounts Josh held at the time of separation were worth approximately $24,000 in total and that Sarah had her own IRA, checking, and savings accounts totaling about $78,974. The chancellor found that "[w]ith the parties' agreement and the [c]ourt's decision on the contested items, Josh has marital assets totaling $104,306.00, and Sarah has marital assets totaling $172,982.00." As an offset to accomplish a fifty/fifty division, the chancellor ordered Sarah to pay Josh $34,172.50 "to equalize the equitable distribution" of marital property.

¶27. Next, the chancellor addressed alimony. After addressing the *Armstrong* factors, the chancellor ordered Sarah to "pay monthly periodic alimony to Josh in the amount of $1,000.00, beginning April 1, 2023." Josh was ordered to pay Sarah $600 per month in child support, and the chancellor noted that these amounts "may be off set for as long as the parties agree." To avoid repetition, we detail the chancellor's findings, analysis, and ruling only on the alimony issue below because it is the subject of this appeal.

### III. Post-Trial Proceedings

¶28. After entry of the final judgment of divorce that incorporated the chancellor's

memorandum opinion, Sarah filed a motion to alter or amend the judgment. Relevant to this appeal, Sarah requested that the chancery court "alter or amend the type of alimony ordered and instead award Josh rehabilitative alimony for a period of time deemed equitable under the totality of [the] circumstances." The chancellor heard Sarah's motion on May 15, 2023. The chancellor denied her motion with respect to the alimony issue in a bench ruling and in his order entered on May 16, 2023, after which Sarah appealed. The details of the hearing and the chancellor's bench ruling are discussed below.

## STANDARD OF REVIEW

¶29. "Under the standard of review utilized to review a chancery court's findings of fact, particularly in the areas of divorce, alimony[,] and child support, this Court will not overturn the court on appeal unless its findings were manifestly wrong." *In re Dissolution of Marriage of Wood*, 35 So. 3d 507, 512 (¶8) (Miss. 2010). "For questions of law, our standard of review is de novo." *Id.* "[W]hen reviewing decisions on alimony, we do not apply or reweigh the *Armstrong* factors de novo but instead recognize that alimony awards are within the discretion of the chancellor, and will not be reversed on appeal unless the chancellor abused his discretion." *Layton v. Layton*, 181 So. 3d 275, 279-80 (¶10) (Miss. Ct. App. 2015) (internal quotation marks omitted). Additionally, "[t]his Court reviews a trial court's denial of a Rule 59 motion under an abuse of discretion standard." *Brooks v. Roberts*, 882 So. 2d 229, 233 (¶15) (Miss. 2004) (referencing M.R.C.P. 59).

## DISCUSSION

I.     **Consideration of Rehabilitative Alimony as an Alternative to Periodic Alimony**

¶30. Sarah asserts that the chancellor erred by failing to analyze or consider rehabilitative alimony as an alternative to periodic alimony when he ordered her to pay Josh $1,000 per month in periodic alimony. We disagree. Rather, based upon our review of the record and the transcript of the entire proceedings, we find that the chancellor did, in fact, analyze and consider rehabilitative alimony in ultimately denying Sarah's request that the judgment be amended to allow for rehabilitative alimony, rather than periodic alimony. Accordingly, we are not persuaded by Sarah's first assignment of error.

¶31. As an initial matter, we recognize that alimony "should not be considered unless the property division results in a 'deficit' to one spouse." *Layton*, 181 So. 3d at 282 (¶17) (citing *Seymour v. Seymour*, 960 So. 2d 513, 519 (¶16) (Miss. Ct. App. 2006)). The term "deficit" used by the courts in this context does not mean that "one spouse[] [has received] assets with a lesser net value than those allocated to the other spouse." *Id.* "Rather, the question is whether the spouse seeking alimony is left '*with a deficit with respect to having sufficient resources and assets to meet his or her needs and living expenses*.'" *Id.* (quoting *Jackson v. Jackson*, 114 So. 3d 768, 777 (¶22) (Miss. Ct. App. 2013)) (emphasis added by the *Layton* Court).

¶32. Mississippi has four types of alimony: periodic,[3] lump sum, rehabilitative, and reimbursement. *Rogillio v. Rogillio*, 57 So. 3d 1246, 1250 (¶11) (Miss. 2011). The periodic and rehabilitative types of alimony are relevant here.

---

[3] The terms "permanent alimony" and "periodic alimony" are used interchangeably to refer to the same type of alimony. *See, e.g.*, *Armstrong*, 618 So. 2d at 1281. We use the term "periodic alimony" in this opinion except where the term "permanent" is used in quoted material.

¶33.    "Periodic alimony is awarded on the basis of need, generally in monthly installments." *Gussio v. Gussio*, 371 So. 3d 734, 748 (¶35) (Miss. Ct. App. 2023).  "It has no fixed termination date, but it automatically terminates upon the remarriage of the recipient or death of the payor."  *Id.*  "It can be modified or terminated in the event of a material change of circumstances for either party."  *Id.*

¶34.    "[R]ehabilitative alimony is similar to periodic alimony, but it includes a 'time limitation' so that it is payable only for a 'fixed period.'"  *Id.* at 749 (¶37).  Rehabilitative alimony is also "modifiable and vests only as it accrues."  *Id.*  The purpose of rehabilitative alimony is to "allow[] the party to get back into the working world in order to become self-sufficient."  *Id.* (quoting *Lauro v. Lauro*, 847 So. 2d 843, 849 (¶15) (Miss. 2003)).

¶35.    The chancellor "must consider the [*Armstrong*] factors in determining whether alimony should be awarded."  *Pierce v. Pierce*, 132 So. 3d 553, 565 (¶30) (Miss. 2014); *see Gussio*, 371 So. 3d at 749 (¶37) (An award of periodic or rehabilitative alimony is based upon the same factors, "i.e., the *Armstrong* factors."). The twelve *Armstrong* factors are:

1.    The income and expenses of the parties;

2.    The health and earning capacities of the parties;

3.    The needs of each party;

4.    The obligations and assets of each party;

5.    The length of the marriage;

6.    The presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;

12

7.	The age of the parties;

8.	The standard of living of the parties, both during the marriage and at the time of the support determination;

9.	The tax consequences of the spousal support order;

10.	Fault or misconduct;

11.	Wasteful dissipation of assets by either party; or

12.	Any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.

*Armstrong*, 618 So. 2d at 1280.

¶36.	In considering the *Armstrong* factors, the appellate courts generally recognize that "[t]he chancellor must make findings of fact regarding [each one]." *Gussio*, 371 So. 3d at 749 (¶39). Further, "[i]t is hornbook law that whether to award alimony and the amount to be awarded are largely within the discretion of the chancellor." *Id.* (quoting *Gutierrez v. Gutierrez*, 233 So. 3d 797, 811 (¶33) (Miss. 2017)). "As a result, the chancellor is given wide latitude in determining an alimony award." *Id.* "We will not disturb the chancellor's decision on alimony on appeal unless it is found to be against the overwhelming weight of the evidence or manifestly in error." *Id.* (quoting *Creekmore v. Creekmore*, 651 So. 2d 513, 517 (Miss. 1995)).

¶37.	In this case, the chancellor recognized the parties had agreed that certain issues would be decided by the court. The chancellor had the parties' signed consent "attached and made a part" of his memorandum opinion. One of the issues the parties requested the chancellor to decide was "[t]he amount, duration, and form of alimony, if any, to be paid by one party

to the other."

¶38. As such, when the chancellor began discussing the alimony issue, he specifically recognized the four types of alimony in Mississippi, namely "permanent, lump sum, rehabilitative[,] and reimbursement." Having already completed the analysis concerning the equitable distribution of the marital property, the chancellor recognized he "must now determine if alimony should be awarded" by utilizing the twelve factors set forth by the Mississippi Supreme Court in *Armstrong*. The chancellor then made specific findings of fact on each of the *Armstrong* factors.

¶39. With respect to Sarah's and Josh's incomes and expenses, the needs of each party, their earning capacities, and the obligations and assets of each party, the chancellor incorporated his prior discussion of these factors in addressing the equitable distribution issue. In that context, the chancellor closely examined the appraisals for the home and three acres and the cabin property, the value of the parties' respective vehicles, the monies each party had at the time of separation, Sarah's medical training, and the fact that Josh "took the role of a stay home Dad, which he performed for a period of seven to eight years." The chancellor also detailed and assessed the information in the parties' Rule 8.05 financial disclosures and the lengthy asset list showing the items that belong to each party by agreement. In the alimony context, the chancellor reiterated that he had "addressed issues concerning the expenses listed by both parties" and then found that "Josh does not appear to have as much room to reduce his expenses as Sarah, but they both can reduce expenses in the Court's opinion."

14

¶40. Additionally, the chancellor specifically assessed the parties' monthly net disposable income and reasonable expenses based upon their Rule 8.05 financial disclosures, as follows:

> Josh's 8.05 shows monthly net disposable income of $2,996.00 (not including alimony income). Josh will be ordered to pay child support of $600.00 per month, reducing his disposable income to $2,396.00. The Court has closely reviewed his 8.05 expenses for he and the children, and believes certain expenses are inflated or have no credibility. The Court finds that Josh's reasonable expenses should be in the range of $3,400.00 per month . . . . Sarah's 8.05 shows monthly net disposable income of $12,970.00, and with the Court awarding her child support of $600.00, she will have disposable income of $13,570.00 to pay her and the children's expenses. The Court likewise believes certain expenses on her 8.05 for [her] and the children are inflated or do not exist. Except for mortgage and vehicle notes, neither party submitted documentary evidence to substantiate their monthly fluctuating expenses. The Court finds that Sarah's reasonable expenses should be in the range of $11,500.

¶41. Following this analysis, the chancellor determined that Josh was left with a monthly deficit of $1,004, while Sarah was left with a monthly surplus of $2,050. As such, the chancellor found that "[t]he evidence reflects a financial disparity in the part[ies'] ability to meet their reasonable expenses."

¶42. Regarding the parties' health, the chancellor incorporated his discussion of this factor as addressed in the context of child-custody under *Albright*.[4] The chancellor found that "[b]oth parties are in general good physical health." Regarding the parties' mental health, the chancellor summarized the testimonies from Sarah and her mother regarding Sarah's level "10" stress level from "working many hours and coming home to perform the duties of a mother" before reducing her hours, as well as her comparatively calm emotional stress level after the separation. Regarding Josh, the chancellor noted that "[w]hen asked about his

---

[4] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

mental health, Josh answered by saying it was 'perfect.' This description gives the [c]ourt some concern."

¶43.　With respect to the remaining seven factors, the chancellor found that "[t]he parties have been married for [fourteen] years. This is considered to have been a relatively long marriage." Regarding the need for childcare, the chancellor found that "[t]he children are school age and ride the bus home in the afternoons. Sarah's mother takes care of them until Sarah gets home without charge." As to the parties' ages—Josh (41) and Sarah (39)—the chancellor found that age "is not a factor currently." In comparing the parties' standard of living during the marriage and at the time support is determined, the chancellor found that "[t]he . . . standard of living for both has changed in that they both have comfortable, livable homes which was not the case prior to the separation. Their standard previously was not great but not bad. Sarah now has the benefit of having paid off her student loans." Regarding tax consequences of the spousal support order, the chancellor found that "Sarah will have to pay taxes on any money paid to Josh designated as alimony." The chancellor found that "neither party [had] more fault or misconduct than the other," and "[n]either party is found to have wrongfully dissipated any assets."

¶44.　Regarding any other factor deemed to be "just and equitable," the chancellor found: "At the present time Josh has not stated any plans for advancement in education that might lead to a higher yearly income. Sarah has placed herself in a position to earn a very good salary. Josh has helped in this regard by being a stay-at-home Dad for seven-eight years."

¶45.　In determining the "amount, duration, and form of alimony, if any" to be allowed, the

16

chancellor found that "Josh testified that he needed and wanted the [c]ourt to award him permanent monthly alimony in the amount of $1,000.00. No other form of alimony was requested. The [c]ourt finds this reasonable under the totality of the circumstances." The chancellor ordered Sarah to "pay monthly periodic alimony to Josh in the amount of $1,000.00, beginning April 1, 2023," and ordered Josh to pay Sarah $600 per month in child support. The chancellor further ordered, though, that "the above amounts may be off set for as long as the parties agree." Thus, by ordering Sarah to pay $1,000 per month in periodic alimony to Josh, the chancellor addressed the "amount" and "form" of alimony as requested in the parties' consent to adjudicate. Further, because periodic alimony, by definition, "has no fixed termination date," *Gussio*, 371 So. 3d at 748 (¶35), the chancellor likewise essentially addressed the alimony's "duration."

¶46. Sarah asserts that the chancellor committed "reversible error" by "limiting his [alimony] inquiry" to periodic alimony when the parties' consent to adjudicate generally requested that the chancery court determine "[t]he amount, duration, and form of alimony, if any, to be paid by one party to the other." We are unpersuaded by this argument because Sarah wholly ignores the rest of the proceedings in this case. The chancellor *did* consider rehabilitative alimony when Sarah raised the issue in her motion to alter or amend the judgment.[5]

---

[5] We also point out that even in the consent to adjudicate, the parties requested the chancery court to decide "the form, *if any*" (emphasis added) of alimony to be awarded. Sarah consistently testified throughout trial that Josh should not receive any alimony at all. In particular, Sarah testified that she only wanted the chancellor to give her "credit" for paying temporary alimony and to deny Josh's claim for alimony in the future. Additionally, although the chancellor specifically offered counsel the opportunity to present an argument

17

¶47. After the chancellor's memorandum opinion and final judgment were entered, Sarah filed a motion that included her request that the chancery court "alter or amend the type of alimony ordered and instead award Josh rehabilitative alimony for a period of time deemed equitable under the totality of [the] circumstances." In her motion, Sarah asserted that "she and Josh were only married for approximately fourteen (14) years, two of which they spent separated"; at the time of trial she had paid Josh "$2,000.00 per month in alimony totaling approximately $48,000.00" pursuant to the temporary order; and that to require her to pay "permanent alimony with no set duration could potentially have her paying alimony for more times than the parties were married."

¶48. At the May 15, 2023 hearing on her motion, Sarah asserted two primary arguments concerning the chancellor's award of periodic alimony to Josh. First, Sarah addressed the chancellor's finding that the parties' fourteen-year marriage "is considered to have been a relatively long marriage." Sarah asserted that it was "a clear error for the Court to have classified [their] marriage as a relatively long marriage." She argued that rehabilitative alimony was more appropriate in this case, citing *Branch v. Branch*, 174 So. 3d 932 (Miss. Ct. App. 2015), a case in which the parties separated after twelve years of marriage and

at the end of trial (that would include, for example, an argument regarding the appropriate form of alimony, if any), Sarah's counsel declined to do so.

As for Josh, we observe that although he did not specifically request "periodic" or "permanent" alimony, he did testify that he did not have sufficient income to meet his expenses without Sarah's assistance and that he therefore was asking for "alimony" in the amount of "$1,000 a month." Josh explained that he wanted "alimony to help with the children and to help me with providing a good house." Josh placed no time limit on his request for alimony, thus squarely meeting the definition of "permanent" or "periodic" alimony. *See, e.g., Gussio*, 371 So. 3d at 748 (¶35).

divorced after fourteen years. *Id.* at 937 (¶¶2-7). The wife was a stay-at-home mother for most of the marriage. *Id.* at (¶3). The chancellor awarded the wife rehabilitative alimony in the amount of $1,000 for seventy-two months, *id.* at (¶8), and this Court affirmed that award. *Id.* at 945 (¶54).[6]

¶49. Sarah also argued that it was "clear error" for the chancellor to fail to consider Josh's relatively young age (forty-one at the time of divorce) in his *Armstrong* analysis. According to Sarah, age was another "big critical factor" under *Armstrong*. She asserted that "Mississippi case law shows patterns of denying permanent alimony [to] parties who are young and able to still work." On this point, Sarah's counsel provided examples, as follows:

> Examples include cases such as: *Craft v. Craft*, [825 So. 2d 605, 610-11 (¶¶21-22) (Miss. 2002)], from the Mississippi Court of Appeals [sic] in which the wife was [thirty-nine] and in good health and was awarded rehabilitative alimony as a result. And, similarly, in *H[u]lts v. H[u]lts*, [11 So. 3d 1273, 1280-81 (¶¶28-34) (Miss. Ct. App. 2009)], a [forty]-year-old wife that was in good health was awarded five years of rehabilitative alimony.

¶50. In response to Sarah's assertions regarding alimony, Josh pointed out that Sarah failed to address "the difference in disparity of income." Josh asserted that this was a "very critical . . . *Armstrong* factor" that the chancellor properly took into account in properly awarding periodic alimony to Josh.

¶51. After hearing the parties' arguments, the chancery court denied Sarah's motion to alter or amend on the alimony issue. In his bench ruling, the chancellor specifically noted that he was familiar with the *Branch* case discussed by Sarah's counsel in arguing that rehabilitative,

---

[6] We note that the only alimony issue on appeal in *Branch* was whether the chancellor erred in awarding the wife rehabilitative alimony at all; periodic alimony was not awarded and was not an issue. *Branch*, 174 So. 3d at 944 (¶49).

not periodic, alimony was proper in this case. The chancellor explained that he "considered the fact and does place a significant role on the disparity of income. That [fourteen]-year marriage, in my opinion, . . . it may be in the middle ground somewhere, but looking at the disparity of income, the [c]ourt is not going to make any changes on [the alimony issue]." In his written order denying Sarah's motion on the alimony issue, the chancellor specifically stated that his bench ruling was made "after hearing argument of counsel and reviewing documentary evidence" and the bench ruling was incorporated by reference into the chancellor's order.

¶52. Despite the chancellor's consideration of her thorough arguments in favor of rehabilitative alimony in her motion and at the May 15 hearing, Sarah asserts that the chancellor erred by excluding any consideration of the rehabilitative alimony issue in this case. She cites *Stroh v. Stroh*, 221 So. 3d 399, 412-14 (¶¶43-51) (Miss. Ct. App. 2017), in support of her assertion. We find that Sarah's contention is unavailing.

¶53. In *Stroh*, this Court reversed a "ruling that the law would not permit an award of lump-sum alimony (rather than periodic alimony) on the facts . . . ." *Id.* at 414 (¶51). In particular, the Court found that the chancellor erred by failing to consider lump-sum alimony based upon his mistaken determination that the *Cheatham*[7] decision "precluded an award of lump-sum alimony, in lieu of periodic alimony" in that case. *Id.* at 413-14 (¶49). According to Sarah, *Stroh* applies here because "the chancellor's outright denial of rehabilitative alimony was 'premised on a clear error or an erroneous legal standard' because the denial

---

[7] *Cheatham v. Cheatham*, 537 So. 2d 435 (Miss. 1988), *overruled on other grounds by Cassell v. Cassell*, 389 So. 3d 305, 315-16 (¶28) (Miss. 2024).

20

was apparently based on an incorrect finding that the issue was not before the court."

¶54.    We find no merit in this argument because we find no indication that the chancellor believed, in any way, that the issue of rehabilitative alimony was not before him after Sarah raised the issue in her motion to alter or amend.  On the contrary, our review of the record (and the May 15 hearing transcript in particular) clearly shows that the rehabilitative-alimony issue was before the chancellor and that he considered it.  Indeed, as set forth in the chancellor's written order, he explicitly considered the argument of counsel and reviewed the evidence before issuing his bench ruling denying Sarah's motion to alter or amend the judgment on the alimony issue.

¶55.    We find *Hine v. Anchor Lake Prop. Owners Ass'n Inc.*, 911 So. 2d 1001 (Miss. Ct. App. 2005), helpful in our analysis.  In that case, this Court rejected the appellants' argument that the chancellor "clearly erred" because he did not consider a particular issue.  *Id.* at 1005 (¶16).  The Court found it was "clear that the [appellants] . . . raised the relevant law" and the chancellor "specifically noted [in his order] that he had considered 'the evidence and the arguments submitted.'"  *Id.*; *see also*, *e.g.*, *Roley v. Roley*, 329 So. 3d 473, 499 (¶74) (Miss. Ct. App. 2021) (rejecting appellant's assignment of error that the chancellor failed to consider his Rule 59 arguments where the chancellor's order contained "the explicit statement . . . that it was made '[a]fter considering the Court file and hearing oral arguments on the matter'").  Because the chancellor in this case *did* consider rehabilitative alimony, *Stroh* does not apply.  Accordingly, we find that Sarah's assertions on this point are not persuasive, and we reject Sarah's first assignment of error.

21

## II.    Application of the *Armstrong* Factors

¶56.    Sarah's second issue on appeal relates to her first.  According to Sarah, the chancellor "limited his inquiry [regarding alimony] to one type—permanent" and, thus, "erred by failing to apply the *Armstrong* factors to decide the proper type of alimony (rehabilitative or periodic) and by failing to consider whether any of the factors supported rehabilitative alimony."  We find that the first premise underlying Sarah's second assignment of error is incorrect.  We have already found above that the chancellor *did* consider rehabilitative alimony.  We also reject her assertions regarding the *Armstrong* factors.  As we discuss below, we find that the chancellor sufficiently analyzed the *Armstrong* factors in the rehabilitative-alimony context when he denied Sarah's post-trial motion seeking to change the periodic alimony to rehabilitative alimony.

¶57.    In this case, the chancellor made detailed findings of fact on each of the *Armstrong* factors in his memorandum opinion that was entered several weeks after the conclusion of the three-day trial.  At that point, the chancellor found that Josh's request for periodic alimony in the amount of $1,000 per month was "reasonable under the totality of the circumstances."  As we have already noted, the chancellor did not consider any other form of alimony, observing that no other form of alimony was sought at trial.

¶58.    After entry of the final judgment of divorce, Sarah filed a motion to alter or amend the judgment, seeking, in relevant part, to reform the alimony award into rehabilitative alimony.  As we found above, the chancellor considered rehabilitative alimony at that point but ultimately denied Sarah's motion on the alimony issue.  In her second assignment of

error, Sarah asserts that reversal is warranted because the chancellor failed to apply the *Armstrong* factors in the rehabilitative-alimony context.

¶59. We recognize that the chancellor did not reiterate a complete on-the-record consideration of the *Armstrong* factors in the rehabilitative alimony context when he issued his bench ruling or order denying Sarah's motion. In *Lowrey*, the Mississippi Supreme Court observed that "[f]actor tests, such as provided in . . . *Armstrong* for alimony, must be considered on the record in every case." *Lowrey v. Lowrey*, 25 So. 3d 274, 280 (¶7) (Miss. 2009)). However, as one respected scholar has noted, the appellate courts, more "[r]ecently[,] . . . have declined to reverse some alimony decisions for failure to make *Armstrong* findings." Deborah H. Bell, *Bell on Mississippi Family Law* § 9.04[2], at 277 (3d ed. 2020).

¶60. Indeed, this Court has recognized in numerous cases that "[w]hile an on-the-record analysis of the factors set out in *Armstrong* is helpful for appellate review, the lack of that analysis in the record does not always warrant reversal, which will be required only in the case of manifest error." *Lewis v. Lewis*, 360 So. 3d 298, 304 (¶18) (Miss. Ct. App. 2023) (quoting *Thompson v. Thompson*, 816 So. 2d 417, 420 (¶9) (Miss. Ct. App. 2002)). "When the chancellor fails to address all factors on-the-record, we are not required to remand the case, and should not, so long as all facts are available to us so as to allow an equitable determination to be made." *Id.* (quoting *Roberson v. Roberson*, 949 So. 2d 866, 869 (¶6) (Miss. Ct. App. 2007)); *see also, e.g.*, *Voda v. Voda*, 731 So. 2d 1152, 1155 (¶11) (Miss. 1999) ("Even if the chancellor has failed to delineate all the factors on the record, where all

23

the facts are available to us, we are not required to remand the case to the trial court."); *Neely v. Neely*, 305 So. 3d 164, 173-74 (¶37) (Miss. Ct. App. 2020); *Goellner v. Goellner*, 11 So. 3d 1251, 1258 (¶24) (Miss. Ct. App. 2009); *Dorsey v. Dorsey*, 972 So. 2d 48, 54 (¶17) (Miss. Ct. App. 2008).

¶61.    Here, the chancellor had already made findings of fact on each of the *Armstrong* factors in his memorandum opinion.  In his bench ruling denying Sarah's post-trial motion, the chancellor reassessed his original finding that the couple's fourteen-year marriage "is considered to have been a relatively long marriage."  He then acknowledged that the fourteen-year marriage "may be in the middle ground somewhere."  Nevertheless, the chancellor again noted the "disparity of income" between the parties and stated that "the Court is not going to make any changes on [the alimony issue]."

¶62.    As such, the chancellor expressly reconsidered the "length of the marriage" factor, as well as implicitly reassessed his findings of fact on the *Armstrong* factors that "assist the courts in identifying a disparity of the parties' resources after equitable distribution," including "the parties' incomes, reasonable expenses, . . . custodial arrangements, assets, and earning capacities."  Bell, *supra*, § 9.04[3], at 279.

¶63.    As noted, the chancellor emphasized the financial/earning capacity between the parties in denying Sarah's motion to reform the alimony award, and he had addressed the *Armstrong* factors relevant to their financial disparity in detail in his memorandum opinion.  After a close review of the parties' Rule 8.05 financial disclosures, the chancellor found that Josh was left with a monthly income deficit of $1,004, while Sarah was left with a monthly

surplus of $2,050. The chancellor further found that "[a]t the present time Josh has not stated any plans for advancement in education that might lead to a higher yearly income. Sarah has placed herself in a position to earn a very good salary. Josh has helped in this regard by being a stay-at-home Dad for seven-eight years."

¶64. With respect to these findings, we find particularly relevant the supreme court's observation that "[a] significant disparity in earning capacity is a major factor in the determination of a periodic alimony award." *Davis v. Davis*, 832 So. 2d 492, 499 (¶23) (Miss. 2002); *see Hammond v. Hammond*, 327 So. 3d 173, 180 (¶21) (Miss. Ct. App. 2021) (When a significant factor in awarding alimony included disparity in earning capacity, this Court found that although the spouse who was awarded alimony "might be able to earn somewhat more, she lacks a college degree, and there is no evidence that she could earn substantially more than she was earning at the time of trial."); *Layton*, 181 So. 3d at 278-79 (¶5) (determining that the chancellor did not abuse his discretion by awarding wife alimony in divorce case where husband's net income was ten times wife's gross income; wife's income was insufficient to meet her expenses; and although the wife "attended junior college and . . . college on two different occasions," she never graduated, and the chancellor "concluded that she was unlikely to complete any college degree at this point"); *Watts v. Watts*, 99 So. 3d 751, 762 (¶33) (Miss. Ct. App. 2012) (finding no abuse of discretion in award of permanent alimony to wife where "[t]he record shows that the chancellor noted [the husband's] earning capacity of $150,000 per year based on his master's degree in nurse anesthesia, while estimating [the wife's] earning capacity to be at best $43,000 per year").

¶65. Regarding the couple's fourteen-year marriage, the chancellor recategorized this as perhaps "middle ground somewhere." But even with this "reclassification," we find no error in the chancellor declining to grant Sarah's motion to reform the alimony awarded from periodic to rehabilitative alimony. This Court has affirmed awards of periodic alimony where the marriages were of comparable lengths. *See Layton*, 181 So. 3d at 287 (¶38) (recognizing that "the chancellor was well within his discretion in finding that the length of the marriage [(ten years)] favored periodic alimony"); *Mamiaro v. Mamiaro*, 179 So. 3d 51, 55 (¶¶17-19) (Miss. Ct. App. 2015) (affirming periodic alimony where the chancellor found the couple's "almost" eleven-year marriage favored periodic alimony); *Watts*, 99 So. 3d at 755, 762 (¶¶4-5, 33) (finding no abuse of discretion in the chancellor's award of permanent alimony where the parties separated after twelve years and agreed to a divorce after thirteen years); *see also Rogillio v. Rogillio*, 101 So. 3d 150, 151, 155 (¶¶5, 21) (Miss. 2012) (recognizing that "the chancellor did not abuse her discretion in finding that the length of the marriage [(less than ten years)] favored [periodic] alimony").

¶66. We recognize that the chancellor did not revisit his findings of fact on the remaining *Armstrong* factors. However, both the supreme court and this Court have recognized that "[i]n examining the *Armstrong* factors, the chancellor may consider them as an 'overall combination' and need not individually list each one." *Rogillio*, 101 So. 3d at 154 (¶16).[8]

---

[8] *Accord Blalack v. Blalack*, 938 So. 2d 909, 912 (¶7) (Miss. Ct. App. 2006) (recognizing that "the chancellor is not required to analyze each *Armstrong* factor individually in his opinion, but is required to view the overall combination of the factors as a whole, opting to address individual factors at his discretion" (internal quotation marks omitted) (quoting *Wells v. Wells*, 800 So. 2d 1239, 1245 (¶12) (Miss. Ct. App. 2001))).

Further, as we have already noted, even if each *Armstrong* factor is not addressed, "we are not required to remand the case, *and should not, so long as all facts are available to us so as to allow an equitable determination to be made.*" *Lewis*, 360 So. 3d at 304 (¶18) (emphasis added).

¶67. Here, the chancellor had already made findings of fact on each *Armstrong* factor. Based upon our own review of the facts of this case, including the chancellor's findings of fact on the remaining factors in his memorandum opinion, we find no reason that a second on-the-record review of the remaining factors was necessary and certainly find no manifest error in the chancellor not doing so.

¶68. To briefly address the chancellor's findings on the remaining factors, we begin by noting that he found that the parties' ages (Josh (41), Sarah (39)) "[was] not a factor currently." Sarah contends that this finding is "clearly erroneous" and that "the age factor weighs against the award of permanent alimony and supports rehabilitative alimony." We do not find that the chancellor's "neutral" rating of this factor was manifestly wrong, particularly in light of the "overall combination" of factors considered by the chancellor. Further, the Court has affirmed awards of periodic alimony in cases involving alimony recipients of comparable ages. *See, e.g.,* *Layton*, 181 So. 3d at 287 (¶35) (periodic alimony recipient thirty-four years old); *Mamiaro*, 179 So. 3d at 58 (¶32) (Carlton, J., concurring in part and dissenting in part) (affirming award of periodic alimony where chancellor found the recipient's age of thirty-seven years was a "neutral" factor).

¶69. Regarding the need for childcare, Sarah asserts that typically the spouse with custody

27

of the children (Sarah in this case) is also the alimony recipient. The chancellor in this case, however, found that "[t]he children are school age and ride the bus home in the afternoons. Sarah's mother takes care of them until Sarah gets home without charge." On these facts, we find no abuse of discretion in the chancellor awarding periodic alimony to Josh simply because the custodial parent might typically be the alimony recipient.

¶70. As for the remaining *Armstrong* factors, the chancellor found that "Sarah will have to pay taxes on any money paid to Josh designated as alimony"; "neither party [had] more fault or misconduct than the other"; and "[n]either party is found to have wrongfully dissipated any assets." We do not find that any of these determinations of fact warrant reversal of the chancellor's periodic alimony award.

¶71. In sum, after considering the chancellor's bench ruling and order and the supporting facts in the record we find that the chancellor *did* assess the *Armstrong* factors in the rehabilitative alimony context, and he was neither manifestly wrong nor did he abuse his discretion when he denied Sarah's motion to reform the alimony award from periodic to rehabilitative alimony.

¶72. Sarah also asserts that "[c]aselaw shows . . . there is not a single *Armstrong* factor that would preclude a rehabilitative alimony award [in this case]." Thus, according to Sarah, "[b]ecause rehabilitative alimony would be proper on [the] facts [of this case], and because the chancellor failed to consider it in his *Armstrong* analysis, . . . this Court should reverse and remand."

¶73. Again, Sarah's argument is based upon the incorrect premise that the chancellor did

not conduct an *Armstrong* analysis in the rehabilitative alimony context. As we have discussed, we find that this premise is not supported by the record. We further observe that in the cases Sarah cites to support her argument, the appellate courts found no abuse of discretion in the chancellor awarding rehabilitative alimony and, accordingly, affirmed the chancellor's decision on that issue."[9] But that outcome does not necessarily support *reversal* of the chancellor's decision to award periodic alimony in this case. On the contrary, in this case, we must apply a "limited abuse of discretion standard" in reviewing the chancellor's decision to award *periodic* alimony. We will not "disturb [his] opinion when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Rankin v. Rankin*, 323 So. 3d 1073, 1077 (¶8) (Miss. 2021). In this regard, we "will not reweigh the testimony and evidence and substitute [our] judgment for that of the chancellor." *Id.* at 1079 (¶17).

## CONCLUSION

¶74. In sum, we find that the chancellor's judgment awarding periodic alimony to Josh "is supported by substantial evidence, the decision is neither manifestly wrong nor clearly erroneous, and an erroneous legal standard was not applied." *Id.* at 1080 (¶19). Sarah appealed no other aspect of the chancery court's March 22, 2023 final judgment of divorce.

---

[9] *See, e.g.*, *Carnathan v. Carnathan*, 722 So. 2d 1248, 1249 (¶3) (Miss. 1998) (affirming chancellor's rehabilitative alimony award); *Prestwood v. Prestwood*, 285 So. 3d 1213, 1219 (¶19) (Miss. Ct. App. 2019) (same); *Branch*, 174 So. 3d at 944-45 (¶¶49-54) (same); *Hults v. Hults*, 11 So. 3d 1273, 1281 (¶34) (Miss. Ct. App. 2009) (finding "it was within the chancellor's discretion to award rehabilitative alimony" rather than periodic alimony); *McCarrell v. McCarrell*, 19 So. 3d 168, 169 (¶1) (Miss. Ct. App. 2009) (affirming chancellor's rehabilitative alimony award).

Accordingly, the final judgment of divorce incorporating the March 22, 2023 memorandum opinion is affirmed in all respects.

¶75.    **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**